**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| COURTNEY ELKIN, On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>WALTER INVESTMENT MANAGEMENT CORP., DENMAR J. DIXON, GEORGE M. AWAD, ANTHONY N. RENZI, and GARY L. TILLETT,<br><br>Defendants. | Class Action No. 2:17-cv-02025-JCJ |

**AMENDED CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I. NATURE OF THE ACTION ..........2

II. JURISDICTION AND VENUE ..........6

III. PARTIES ..........7

IV. BACKGROUND ..........9

V. SUMMARY OF DEFENDANTS' FRAUD ..........12

A. The Key Role Walter's Deferred Tax Assets Had on Walter's Stockholders Equity, Related Financial Metrics Important to Investors and Analysts, and Required Financial Covenants ..........12

1. Walters' Stockholders' Equity Balance and Important Financial Metrics Derived from Stockholders' Equity ..........13

2. Walter's Required Financial Covenants ..........15

B. Walter Announces the Need to Restate Walter's Deferred Tax Asset Balances, Which Greatly Affects Walter's Outstanding Debt Agreements ..........16

C. Defendants Restate Walter's Deferred Tax Asset Balances, Resulting in a Negative Stockholders' Equity Balance and Substantial Doubt About the Company's Ability to Continue as a Going Concern ..........21

D. Defendants Were, At Minimum, Deliberately Reckless In Their Valuation Allowance Assessment For Walter's Reported Deferred Tax Assets ..........23

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........29

A. Defendants' False and Misleading Statements in the Disclosure of Walter's Second Quarter of 2016 Financial Results ..........30

B. Defendants' False and Misleading Statements in the Disclosure of Walter's Third Quarter of 2016 Financial Results ..........32

C. Defendants' False and Misleading Statements in the Disclosure of Walter's 2016 Fiscal Year Financial Results ..........34

D. Defendants' False and Misleading Statements in the Disclosure of Walter's First Quarter of 2017 Financial Results ..........36

E. The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications ....37

VII. Defendants' Violations of GAAP Resulted in False and Misleading Financial Statements ....40

VIII. LOSS CAUSATION ....43

IX. ADDITIONAL SCIENTER ALLEGATIONS ....48

A. The Multitude of Government Investigations and Other Internal Control Weaknesses During, and Before, the Class Period Displays Walter's Lax Internal Control Environment ....49

B. The Individuals Defendants Were "Hands-On" Managers ....51

X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....52

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ....54

XII. CLASS ACTION ALLEGATIONS ....55

XIII. CLAIMS FOR RELIEF ....57

XIV. PRAYER FOR RELIEF ....61

XV. JURY DEMAND ....61

1. Lead Plaintiff Richard Worley ("Plaintiff"), by and through his undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of himself and all other similarly situated purchasers of the securities of Walter Investment Management Corp. ("Walter" or the "Company") from August 9, 2016 through August 1, 2017, inclusive (the "Class Period").

2. Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on, among other things, the independent investigation of court-appointed Lead Counsel. This investigation included, among other things, a review and analysis of: (i) Walter's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Walter's investor calls; (vi) Walter's press releases and other public statements issued by the Company; (vii) media reports about the Company; (viii) interviews with former employees and other potential witnesses with relevant information (some of whom have provided information in confidence) throughout the course of counsel's investigation; (ix) an accounting analysis; (x) pertinent court filings; and (xi) other publicly available material and data identified herein. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (defined herein) or are exclusively within their custody or control. Plaintiff believes that substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

3. Walter is an independent servicer and originator of mortgage loans, and a servicer of reverse mortgage loans. In addition to servicing the loans that Walter originates, it services loans for Ginnie Mae, Fannie Mae, and other U.S. government-sponsored entities ("GSEs"), third-party securitization trusts, and other credit owners.

4. During the Class Period, Walter reported its eleventh straight quarter of losses for the Company. Besides its continued failure to be profitable, Walter was also substantially indebted with over $4.2 billion in loans outstanding at the end of 2016. These loans contained numerous financial covenants and other obligations as part of these debt agreements which placed significant strain on the Company's liquidity and capital resources.

5. Because of these financial pressures facing the Company, Walter's investors and analysts focused on the Company's stockholders' equity balances, also known as its net worth or book value, to determine the Company's financial condition. Stockholders' equity is a company's total liabilities subtracted from its total assets, and represents the equity stake shareholders have in a company after all its debts are paid. Investors and analysts similarly paid keen attention to Walter's book value per share, *i.e.*, stockholders' equity on a per share basis, tangible book value per share, *i.e.*, stockholders' equity after removing intangible assets, on a per share basis, and assets that comprised a material portion of the stockholders' equity balance, such as Walter's deferred tax assets (or "DTA").

6. Beyond being of extreme interest to shareholders, maintaining its stockholders' equity, or net worth, and tangible net worth were conditions of the Company's and its subsidiaries' many financial covenants and financial obligations with its lenders and with Ginnie Mae and other GSEs. In fact, Walter warned that the failure to comply with these financial covenants and

obligations could be severe: a breach of a financial covenant, such as tangible net worth requirements, could result in the Company not being able to access necessary capital, enforcement of liens against assets securing the loan, or acceleration of outstanding obligations. Additionally, noncompliance with GSE mandatory capital requirements, such as required adjusted net worth, could include suspension or termination of Walter's agreements with that GSE, which consequently would end future origination or securitization of mortgage loans or terminate its status as an approved seller or servicer for that GSE.

7. At the beginning of the Class Period, Defendants were focused on ways to improve the Company's capital situation. This was likely in part due to the fact that Walter's stockholders' equity balance had been sharply declining in the preceding years: from a balance of $1.167 billion as of December 31, 2013 to just $280.26 million as of December 31, 2016, as originally reported.

8. In November 2016, the Company announced that it had achieved "solid steps" on Defendants' "capital efficiency efforts." Just months later in March 2017, however, Walter announced that it had engaged legal and financial advisors to review potential actions that Defendants could take to reduce the Company's leverage as part of its "debt restructuring initiative." This announcement essentially conceded that Walter's previous deleveraging initiatives had not proved as successful as previously claimed, and further, that the possibility of debt restructuring could come at the expense of shareholder dilution.

9. On this news, Walter's stock fell almost 39%. Over the next seven trading days, Walter's stock continued to freefall, cumulatively declining an additional almost 58%. In total, Walter's stock price fell from $2.70 per share on March 13, 2017, the day before Walter's announcement, to close at $0.70 per share on March 23, 2017.

10. On May 26, 2017, Walter announced that due to an accounting error, it would need to restate its previously issued financial reports on Form 10-K for the fiscal year ended December 31, 2016, and its Form 10-Qs for the quarterly periods ended June 30, 2016, September 30, 2016, and March 31, 2017. In the same announcement, the Company further explained that Walter had "become aware of an error in the calculation of the valuation allowance on the deferred tax asset balances."

11. In response to this announcement, one analyst commented that Walter's need to restate its deferred tax asset balances was important because "WAC's $300M DTA ($8.22/share) compares with stated book value per share (BVPS) of $7.76 and tangible BVPS of $6.16 as of 1Q17. The anticipated restatement of the valuation allowance against the DTA will materially reduce the DTA." Indeed, Walter's deferred tax asset balances made up a significant portion of the Company's total stockholders' equity during the Class Period.

12. Walter's May 26, 2017 disclosures also noted that due to Walter's need to restate numerous of its financial statements, the Company would need to seek amendments, waivers, and/or forbearances to a number of Walter's and its subsidiaries' outstanding debt agreements.

13. Walter's stock fell over 21%, or $0.30 per share, to close at $1.11 per share on May 30, 2017, the first trading day after the announcement that the Company would need to restate its financial statements.

14. Although Walter was eventually able to obtain permanent waivers from its lenders for "any default, event of default, amortization event, termination event or similar event resulting or arising from the Restatement," these waivers were received in tandem with an agreement to a proposed financial restructuring of the Company. The terms of this restructuring come at substantial cost to shareholders in that their shares will be greatly diluted.

15. Walter's stock fell almost 39%, or $0.32 per share, to close at $0.51 per share on August 2, 2017 following the announcement of Walter's proposed restructuring. Walter's stock continued to fall an additional $0.11 per share over the next two trading days, or 21.6%, to close at $0.40 on August 4, 2017.

16. On August 9, 2017, shortly after the end of the Class Period, Defendants finally released its restated financial reports. As analysts forewarned, the restated financials materially reduced Walter's deferred tax assets. For example, for the fiscal year ended December 31, 2016, Walter restated its deferred tax assets downward by almost $305 million – instead of a previous deferred tax asset balance of just under $300 million, Walter was now reporting that the Company had a deferred tax ***liability*** of almost $5 million.

17. The restated deferred tax assets also materially reduced Walter's stockholders' equity balances. For the year ended December 31, 2016, Walter's stockholders' equity balance of $280.3 million was also reduced by almost $305 million, and was now a stockholders' ***deficit*** of over $24 million.

18. The restated financials also included a note that management determined that "there is substantial doubt as to [Walter's] ability to continue as a going concern." Although Walter disclosed that it was able to obtain waivers from its lenders, it came at the expense of Walter's available liquidity and capital resources.

19. Walter further disclosed that due to the restatement, one of its main subsidiaries "was not in compliance with certain financial covenants required by Ginnie Mae and Fannie Mae" as of June 30, 2016, September 30, 2016, and December 31, 2016. Defendants further disclosed in the restated Form 10-K/A for the 2016 fiscal year that one of Walter's subsidiary's actual adjusted net worth, Walter's most restrictive covenant imposed by the GSEs, was only $51.3 million as of

December 31, 2016, less than half of the required adjusted net worth that this subsidiary was required to maintain.

20. Moreover, in the restatement, Defendants admitted that the Company was "double-counting . . . expected future taxable income associated with the projected reversals of taxable temporary differences" in certain of its prior financial statements. As explained further herein, Defendants' failure to recognize that Walter's calculation was double-counting future taxable income was, at minimum, deliberately reckless.

21. During the first two quarters of the Class Period, at the time the Company began double-counting its future taxable income, Walter failed to take any valuation allowance against its deferred tax assets. A valuation allowance is necessary when it is expected that some or all of a deferred tax asset would not be realized, as was the case for Walter, who faced its ninth and tenth straight quarters of net losses at this time. Besides continued losses, Defendants were also taking large goodwill impairments due to deteriorating business conditions in two of Walter's operating units, further necessitating a valuation allowance.

22. Instead, of properly accounting for its future taxable income, Defendants materially overstated Walter's deferred tax asset balances in their Class Period financial statements, which had the effect of materially overstating the diminishing equity balance left in the Company. Due to these materially misleading misstatements and/or omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and the Class have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

24. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

25. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Many of the acts charged herein, including the dissemination of materially false and/or misleading information occurred in substantial part in this Judicial District. Additionally, Walter's primary operations are located within this Judicial District.

26. In connection with the acts alleged in this complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

27. On June 12, 2017, the Court appointed Richard Worley as Lead Plaintiff. Plaintiff, as set forth in a previously filed PSLRA certification (Dkt. No. 5-5), incorporated herein, purchased Walter securities during the Class Period and suffered damages as a result of the violations of federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

28. Defendant Walter is a company incorporated under the laws of Maryland. Walter's principal executive offices are located at 1100 Virginia Drive, Suite 100, Fort Washington, Pennsylvania. Previously, Walter's headquarters were located at 3000 Bayport Drive, Suite 1100, Tampa, Florida. Walter's common stock trades under the ticker symbol "WAC" on the New York Stock Exchange ("NYSE"), which is an efficient market.

29. Defendant George M. Awad ("Awad") was the Company's Interim Chief Executive Officer ("CEO") and President from June 30, 2016 through September 12, 2016. Awad has also served as a director of the Company and the Chairman of the Board of Directors (the "Board") since June 2016. During the Class Period, Awad signed Walter's quarterly and annual reports and

quarterly certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Walter's internal controls over financial reporting. During the Class Period, Awad participated in the Company's quarterly earnings conference call held on August 9, 2016. Awad was a direct and substantial participant in the fraud.

30. Defendant Anthony N. Renzi ("Renzi") has been the Company's CEO and President since September 12, 2016. Renzi also serves as a director of the Company's Board. During the Class Period, Renzi signed Walter's quarterly and annual reports and quarterly and annual certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Walter's internal controls over financial reporting. During the Class Period, Renzi participated in the Company's quarterly earnings conference calls held on November 9, 2016, March 14, 2017, and May 10, 2017. Renzi was a direct and substantial participant in the fraud.

31. Defendant Gary L. Tillett ("Tillett") has been the Company's Executive Vice President and Chief Financial Officer ("CFO") since March 1, 2014. Tillett is also Walter's Principal Financial Officer and Principal Accounting Officer. Tillett previously served as a partner at PwC, and was employed by PwC for over 31 years. Tillett is a Certified Public Accountant. During the Class Period, Tillett signed Walter's quarterly and annual reports and quarterly and annual certifications pursuant to SOX stating that the financial information contained in the Company's financial reports was accurate and disclosed any material changes to Walter's internal controls over financial reporting. During the Class Period, Tillett participated in the Company's quarterly earnings conference calls August 9, 2016, November 9, 2016, March 14, 2017, and May 10, 2017. Tillett was a direct and substantial participant in the fraud.

32. Defendants Awad, Renzi, and Tillett are collectively referred herein as the "Individual Defendants." Defendant Walter and the Individual Defendants are collectively referred to as "Defendants."

33. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Walter's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each individual defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. BACKGROUND

34. Walter is a diversified mortgage banking firm that primarily services and originates residential loans, including reverse loans. The Company focuses on generating revenue through recurring fee-for-service management of mortgages and selling the mortgages it originates while retaining the right to service those mortgages. Walter operates through its three reportable segments: servicing; originations; and reverse mortgage.

35. Walter grew rapidly after its spin-off from Walter Energy, Inc. in April 2009 through numerous acquisitions, including the acquisitions of: Green Tree Servicing LLC ("Green Tree"), one

of the largest mortgage loan servicers of residential loans in the country, in 2011; Reverse Mortgage Solutions ("RMS"), providing servicing and originations of reverse mortgages, in 2012;[1] Ditech Mortgage Corp. in March 2013;[2] and significant mortgage servicing rights, an asset that retains the right to service a pool of mortgage loans in exchange for a fee, in 2013 and 2014.

36. By the end of 2015, Walter was servicing 2.2 million residential loans with an unpaid principal balance of $266.6 billion, ranking in the top 10 largest residential loan servicers in the United States, originated $25.1 billion in mortgage loan volume for the year, and in the reverse mortgage sector, was the third leading issuer of home equity conversion mortgage[3]-backed securities for the year.

37. Despite Walter's success in the size of the loans it originated and serviced during its rapid expansion, the Company has struggled in recent years. In 2015, Walter agreed to pay $63 million to settle charges brought by the Consumer Financial Protection Bureau ("CFPB") against Green Tree for mistreating mortgage borrowers and settled a False Claims Act for $29.63 million in which Walter was alleged to have submitted false reverse mortgage claims to the U.S. Department of Housing and Urban Development. In addition, Walter reported declining revenues, increasing costs, and significant losses in 2014, 2015, and 2016.

38. Walter is also a highly leveraged company. The Company and its subsidiaries took out significant debt to pay for its acquisition of Green Tree, and also relies on this significant financial assistance as part of its obligations as a mortgage servicer. As a servicer of reverse

---

[1] In December 2016, the Company decided to exit the reverse mortgage originations business, becoming effective in January 2017.

[2] Green Tree was subsequently merged with Ditech Mortgage Corp. Walter consolidated the two subsidiaries under the name Ditech Financial LLC, operating as "ditech, a Walter Company" (hereinafter, "Ditech"), effective as of August 31, 2015.

[3] A home equity conversion mortgage is the Federal Housing Administration's reverse mortgage program.

mortgages, although guaranteed by Ginnie Mae,[4] Walter is responsible for advancing payments to the home equity conversion mortgage-backed vehicles to repurchase loans that reach 98% of the limit or any loan that is more than 90 days delinquent. Although Ginnie Mae eventually reimburses Walter, this operation is an enormous cash drain on Walter's limited cash funds.

39. As of December 31, 2015, the Company had outstanding indebtedness of approximately $4.9 billion. During the Class Period, Defendants were focused on ways to "strategically de-lever" the Company. As part of their debt reduction plan, Defendants explained during 2016 that they planned to improve Walter's leverage ratio by selling its mortgage servicing rights assets while retaining the servicing of these loans through sub-servicing agreements. With this excess cash, Defendants planned to acquire Walter's debt.

40. On the November 9, 2016 earnings call, Defendant Renzi reported that "solid steps" had been taken since the end of the third quarter of 2016 on Defendants' "capital efficiency efforts[,]" including negotiating transactions that would generate an expected $90 million in cash for the Company. Defendant Renzi further explained that "[g]iven the amount of liquidity generated, we've engaged advisors to assist in exploring certain opportunities with respect to our corporate debt[,]" highlighting the Company's success in repurchasing certain of its convertible notes with a par value of $47.5 million for just $24.8 million.

41. By the end of 2016, the Company's outstanding indebtedness slightly shrank to approximately $4.2 billion, the majority of which was secured, including:

a. Walter's 2013 Term Loan, a $1.4 billion senior secured first lien term loan, set to mature at the end of 2020, and a 2013 Revolver, a senior secured revolving credit facility that allows Walter to borrow up to $100 million under certain conditions. Together the 2013 Term Loan

[4] The Government National Mortgage Association, or Ginnie Mae, is a wholly owned government corporation within the U.S. Department of Housing and Urban Development.

and 2013 Revolver are secured by almost all of the Company's assets (collectively the "2013 Credit Agreement");

b. Walter's Senior Notes, $538.7 million aggregate principal amount outstanding of 7.875% senior notes due at the end 2021, under which Walter's obligations are guaranteed on an unsecured senior basis by most of the Company's subsidiaries (the "Senior Notes");

c. Walter's Convertible Notes, $242.5 million aggregate principal amount outstanding of 4.50% convertible senior subordinated notes due on November 1, 2019 (the "Convertible Notes");

d. $738.2 million, in aggregate, indebted under different servicing advance financing structures, used to fund servicer and protective advances Walter is responsible for under its servicing agreements (the "advance facilities"); and

e. $1.2 billion, in the aggregate, indebted under various master repurchase agreements with lenders that provide warehouse facilities used to fund the origination and purchase of residential loans and home equity conversion mortgage securitization pools (the "warehouse facilities").

## V. SUMMARY OF DEFENDANTS' FRAUD

### A. The Key Role Walter's Deferred Tax Assets Had on Walter's Stockholders Equity, Related Financial Metrics Important to Investors and Analysts, and Required Financial Covenants

42. Deferred tax assets (or "DTA") represent the future effects on income taxes measured by the applicable enacted tax rate resulting from temporary differences and carryforwards. Temporary differences are the differences between a tax basis of an asset or liability and that asset or liability's reported amount in the financial statements that will result in a taxable or deductible amount in future years. Carryforwards are tax deductions or credits that cannot be utilized on a tax

return during a current year that may be carried forward to reduce taxable income or taxes payable in a future year.

43. Generally Accepted Accounting Principles ("GAAP") require a reduction, or a valuation allowance, of the measurement of deferred tax assets that are not expected to be realized. GAAP further provides that all available evidence, both positive and negative, be considered to determine whether, based on the weight of the evidence, a valuation allowance for deferred tax assets is needed.

### 1. Walters' Stockholders' Equity Balance and Important Financial Metrics Derived from Stockholders' Equity

44. Both before and throughout the Class Period, due to the Company's struggle to report positive operating results and Walter's enormous outstanding levels of indebtedness, investors and analysts paid careful attention to stockholders' equity. Stockholders' equity represents the balance or amount of the owners' (*i.e.*, equity investors or shareholders) equity in a company. Often referred to as the net worth or book value of a company, stockholders' equity is calculated by subtracting a company's total liabilities from a company's total assets.

45. Walter's stockholders' equity balance shrunk sharply from the end of 2013 through the end of 2016: from a balance of $1.167 billion as of December 31, 2013 to just $280.26 million as of December 31, 2016, as originally reported. This massive decline in stockholders' equity was the result of increasing net losses for the Company in each of the 2014, 2015, and 2016 fiscal years.

46. As a result of Walter's sustained losses in the recent years and substantial indebtedness, the Company's investors and analysts were keenly focused on Walter's stockholders' equity, or book value, and the related financial metrics of book value per share and tangible book value per share. Book value per share (or "BVPS") is Walter's stockholders' equity balance divided by the number of shares outstanding, and represents the dollar value remaining for each stockholder

after all assets are liquidated and the Company's debts are paid. Tangible book value per share (or "TBVPS") measures the value of a company for its shareholders also on a per-share basis, but removes any intangible assets, such as goodwill, that cannot be sold upon a liquidation of a company.

47. Analysts regularly reported Walter's book value per share and/or tangible book value per share in each of their quarterly reports issued shortly after Walter reported its financial results. For example, Oppenheimer reported Walter's current stockholders' equity and tangible book value per share in its side bar on the first page of their quarterly equity research reports. Wells Fargo reported Walter's current tangible book price per share in each of its quarterly equity research reports, and both Credit Suisse and Barclays reported actual and estimated book value per share and tangible book value per share for the Company in each of their quarterly equity research reports. In addition, both Wells Fargo and Credit Suisse framed their price target for Walter in terms of a discount to the tangible book price per share in their Class Period reports.

48. Recognizing the importance shareholders and analysts placed on these metrics, Walter regularly reported its book value per share in its stockholder presentations attached to the Company's Form 8-Ks filed with the SEC that announced Walter's periodic financial results.

49. Walter's deferred tax asset balances comprised a significant portion of Walter's stockholders' equity balance, and correspondingly, Walter's book value and tangible book value per share.

50. Analysts were acutely aware of the affect deferred tax assets had on stockholders' equity and the related book and tangible book value per share metrics. For example, each of Credit Suisse's May 6, August 10, November 9, 2016 and its January 4, March 13, and May 10, 2017 reports explained that until Walter can make progress in improving profitability and deleveraging,

"we do not see shares trading above tangible book value. The biggest risk would be a further write-down to tangible book value from further rate declines or a write-off of the DTA given continued losses."

51. Barclays and Compass Point analysts additionally separated out the affect Walter's deferred tax assets had on the Company's tangible book price per share. Barclays reported in its August 10, 2016 report that for the second quarter of 2016, "tangible book value per share declined ~6% to $4.72 . . . and was better than our $2.61 estimate solely attributable to the ~$125mm increase in the DTA . . . . Excluding the DTA increase, tangible book value would have been closer to $1.22/shr."

52. Compass Point similarly isolated Walter's deferred tax asset balance's influence on the tangible book price per share in both its March 16, 2017 and May 10, 2017 reports, noting that the tangible book price per share would have been -$2.16 and -$2.05 per share as of December 31, 2016 and March 31, 2017, as compared to the reported value of $6.08 and $6.16, respectively.

**2. Walter's Required Financial Covenants**

53. The master repurchase agreements facilitating Walter's $1.2 billion of indebtedness through the Company's warehouse facilities contained "customary events of default and covenants." The most significant of these were financial covenants. Walter explained in its Form 10-K for the 2016 fiscal year that the "[f]inancial covenants that are most sensitive to the operating results and resulting financial position are minimum tangible net worth requirements[ and] indebtedness to tangible net worth ratio requirements," among others.

54. The failure to comply with these financial covenants was severe: Defendants explained that if the Company breached a "covenant without obtaining a waiver or amendment, we may be subject to termination of future funding, enforcement of liens against assets securing the

respective facility, repurchase of assets pledged in a repurchase agreement, acceleration of outstanding obligations, or other adverse actions."

55. Walter has been, and is, dependent on Ginnie Mae and Fannie Mae and other GSEs and agencies that have residential loan programs. The Company stressed the importance of maintaining its relationships, ability to remain qualified to participate in these GSE programs, and ability to satisfy various GSE net worth, liquidity, and other financial requirements.

56. As part of these programs, Walter and its subsidiaries had to meet "financial covenants related to minimum levels of net worth[.]" Walter further explained that noncompliance with these "mandatory imposed capital requirements" without receiving a waiver "could include suspension or termination of the selling and servicing agreements, which would prohibit future origination or securitization of mortgage loans or being an approved seller or servicer for the applicable GSE."

57. Tangible net worth is a common calculation of a company's net worth, and is determined by subtracting a company's total liabilities from a company's tangible assets, *i.e.*, it is a company's tangible book value. As explained above, during the Class Period, Walter's deferred tax assets comprised a material portion of both Walter's book value, or net worth, and tangible book value, or tangible net worth.

### B. Walter Announces the Need to Restate Walter's Deferred Tax Asset Balances, Which Greatly Affects Walter's Outstanding Debt Agreements

58. On March 14, 2017, in the discussion of the financial condition and results of operation for the 2016 fiscal year in Walter's Form 10-K, Defendants announced that they had "engaged legal and financial debt restructuring advisors and have been reviewing a number of potential actions we may take to reduce [Walter's] leverage" as part of the Company's "debt

restructuring initiative." Later that day, on a pre-recorded earnings call, Defendant Renzi reiterated this announcement.

59. This announcement indicated to investors and analysts that deleveraging the Company was more difficult than previously disclosed, and the possibility of debt restructuring came at the expense of potential shareholder dilution. In response to this announcement, analysts lowered their price targets for Walter. Credit Suisse lowered its target price for Walter from $5 to $2, due in large part to Walter's possible debt restructuring. Compass Point analysts similarly lowered the price target to just $0.50 from a previous target of $2.50, noting that "deleveraging the balance sheet continues to prove more difficult than WAC management anticipated." Compass Point earlier commented that the "[i]ncrease to tangible book value may be 'silver lining,' if there is one" in its discussion of Walter's financial results for the 2016 fiscal year and the announcement of Walter's debt restructuring initiative.

60. Then, on May 26, 2017, Walter announced that due to an accounting error, its previously issued financial reports on Form 10-K for the fiscal year ended December 31, 2016, its Form 10-Qs for the quarterly periods ended June 30, 2016, September 30, 2016 and March 31, 2017, and the earnings releases and other financial communications for those periods should no longer be relied upon. The announcement further explained that:

> The Company has become aware of an error in the calculation of the valuation allowance on the deferred tax asset balances . . . . The Company's methodology effectively resulted in a duplication of the reversal of taxable temporary differences. Accordingly, the Company is in the process of revising its calculation to eliminate the duplication.
>
> Although the Company has not determined the precise amount of the adjustments to the valuation allowance on the deferred tax asset balances . . . , such amounts are anticipated to be material. . . . The impact of these adjustments will be to materially reduce the overall net deferred tax asset balances by increasing the valuation allowance, and reducing the tax benefit recorded in the Company's previously issued consolidated statements of comprehensive loss.

61. In this announcement, Walter further explained that it had reassessed the Company's internal control over financial reporting and disclosure controls and "has determined that a material weakness relating to the ineffective review of the tax calculations associated with the valuation allowance on the deferred tax asset balances existed for the affected periods, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures were ineffective."

62. In response to this announcement, analysts at Compass Point commented that the Company's need to restate its deferred tax asset balances was important because "WAC's $300M DTA ($8.22/share) compares with stated book value per share (BVPS) of $7.76 and tangible BVPS of $6.16 as of 1Q17. The anticipated restatement of the valuation allowance against the DTA will materially reduce the DTA."

63. Walter's May 26, 2017 announcement also noted that due to Walter's need to restate numerous of its financial statements, the Company would need to seek amendments, waivers, and/or forbearances to a number of Walter's and its subsidiaries outstanding debt agreements.

64. Throughout June and July 2017, Defendants sought and received limited waivers from its warehouse and advance facility lenders "to the extent necessary to waive any default, event of default, amortization event, termination event or similar event resulting or arising from the Restatement." These limited waivers were to expire on July 31, 2017.

65. On July 27, 2017, in a Form 8-K filed with the SEC, Walter announced that it had received permanent waivers from its warehouse and advance facility lenders. These permanent waivers waived "any default, event of default, amortization event, termination event or similar event resulting or arising from the Restatement," including any conclusion about the Company's ability to continue as a going concern.

66. The permanent waivers from the warehouse and advance facility lenders, however, were conditioned upon both the 2013 Term Loan lenders and the Senior Notes noteholders entering into similar permanent waivers with Walter by July 31, 2017.

67. On August 1, 2017, in a Form 8-K with attachments, Defendants announced that more than 50% of the loans and/or commitments outstanding under the 2013 Credit Agreement (the "Consenting Term Lenders") entered into a waiver on July 31, 2017, pursuant to which the Consenting Term Lenders agreed to waive certain events of default under the 2013 Credit Agreement, including those arising under the forthcoming Restatement, any "going concern" qualification delivered in connection with the forthcoming Restatement, and any default or event of default that may arise as a result of the forthcoming restatement or any "going concern" qualification.

68. Also on July 31, 2017, more than 50% of the noteholders of the Senior Notes agreed that any existing defaults as a result of Walter's need to restate due to the duplication error in calculating the Company's deferred tax assets shall be waived and deemed to have been cured, and that they will not enforce or take other action or enforcement of any rights or remedies due with respect to the filings that need to be restated under the terms of the Senior Notes.

69. The August 1, 2017 Form 8-K also announced that on July 31, 2017, the Consenting Term Lenders and Walter entered a Restructuring Support Agreement (the "RSA") agreeing to principal terms of a proposed financial restructuring of the Company. The proposed financial restructuring will be implemented through an "Out-of-Court Restructuring" provided there is enough stakeholder support from Walter's outstanding debt agreement holders for such a restructuring, or if sufficient support is not reached, a prepackaged reorganization under Title 11 of the U.S. Bankruptcy Code.

70. Under the RSA, and its subsequent amendments, Walter agreed to prepay $100 million of the 2013 Credit Agreement term loans by August 23, 2017. Walter also has until September 30, 2017 (amended from an earlier date of August 31, 2017) to negotiate a restructuring support agreement consistent with the RSA with two-thirds of the aggregate outstanding principal amount of the Senior Notes.

71. In addition, Walter must solicit and obtain agreement from at least 95% of the 2013 Credit Agreement term lenders, 95% of the noteholders of the Senior Notes, and 95% of the noteholders of the Convertible Notes by November 1, 2017.

72. If the Out-of-Court Restructuring occurs, Walter will pay down an additional $200 million in addition to the earlier $100 million paid in August 2017, and in exchange will extend the maturity of the 2013 Credit Agreement term loan to June 2022. The Senior Notes will be exchanged for $200 million of second lien notes along with a to-be-determined amount of common equity, and the Convertible Notes will be tendered for an amount not greater than $40 million.

73. The impact of these announcements on August 1, 2017 were severe. Walter's stock dropped almost 39% on August 2, 2017, and continued to fall an additional 21.6% over the next two trading days. On August 4, 2017, Moody's downgraded its ratings for Walter's debt, commenting that "[u]ncertainty regarding the outcome of the restructuring proposal and the increased risk of a bankruptcy filing should it not succeed further impairs the Company's franchise." Credit Suisse analysts noted that the cost of the RSA and reducing some of Walter's enormous indebtedness comes "at the cost of dilution of existing holders."

### C. Defendants Restate Walter's Deferred Tax Asset Balances, Resulting in a Negative Stockholders' Equity Balance and Substantial Doubt About the Company's Ability to Continue as a Going Concern

74. On August 9, 2017, Walter issued a restatement of its financial results for the fiscal year ending December 31, 2016 and for the quarterly results for the fiscal quarters ended on June 30, 2016, September 30, 2016, and March 31, 2017 (the "Restatement").

75. The Restatement corrected Walter's materially misstated deferred tax asset balances due to Defendants' previous "error in the calculation of the valuation allowance on the deferred tax assets." The Restatement further detailed the calculation error in the original filings:

> [A]n error was made that resulted in the ***double-counting of expected future taxable income*** associated with the projected reversals of taxable temporary differences (i.e., deferred tax liabilities). Accordingly, ***the Company has revised its calculation to reflect the removal of the duplicative amounts***, and reevaluated all sources of estimated future taxable income used to assess the recoverability of deferred tax assets under GAAP after taking into account both positive and negative evidence through the issuance date of the restated financial statements to consider the effect of the error. (Emphasis supplied).

76. The Restatement further explained that as a result of the identification of the double-counting error, Walter's "management determined that the Company did not maintain effective internal controls with respect to the operating effectiveness of the review of the tax calculations associated with the valuation allowance on the deferred tax asset balances[,]" characterizing the review of these tax calculations as "ineffective." Management "further determined that this control deficiency constitutes a[] . . . material weakness in internal controls over financial reporting."

77. As a result of the Restatement, Walter's deferred tax assets were tremendously decreased—in two financial periods the decrease was larger than the actual deferred tax asset balance, and thus almost $300 million in deferred tax assets became deferred tax liabilities. In fact, the difference between the original and restated values of the deferred tax assets/liabilities were

almost as large – if not actually larger – than the original value of Walter's reported deferred tax assets:

| Financial Period | Deferred Tax Assets As Reported (in thousands) | Deferred Tax Assets (Liabilities) As Restated (in thousands) | Difference (in thousands) | Percentage Overstated |
|---|---|---|---|---|
| 2Q 2016 | $273,816 | $16,254 | ($257,562) | 1,585% |
| 3Q 2016 | $425,878 | $56,875 | ($369,003) | 649% |
| FY 2016 | $299,926 | ($4,774) | ($304,700) | 6,382% |
| 1Q 2017 | $299,629 | ($2,901) | ($302,530) | 10,428% |

78. Correcting the double-counting error also greatly decreased the reported value of stockholders' equity in the Company:

| Financial Period | Stockholders' Equity As Reported (in thousands) | Stockholders' Equity (Deficit) As Restated (in thousands) | Percentage Overstated |
|---|---|---|---|
| 2Q 2016 | $403,378 | $145,816 | 177% |
| 3Q 2016 | $303,467 | ($65,536) | 563% |
| FY 2016 | $280,260 | ($24,440) | 1,247% |
| 1Q 2017 | $282,970 | ($19,110) | 1,581% |

79. Additionally, in three of the four restated financial periods, Walter's reported net loss vastly increased:

| Financial Period | Net Income (Loss) As Reported (in thousands) | Net Income (Loss) As Restated (in thousands) | Net Income (Loss) Per Share As Reported | Net Income (Loss) Per Share As Restated | Percentage Understated |
|---|---|---|---|---|---|
| 2Q 2016 | ($232,401) | ($489,963) | ($6.49) | ($13.68) | 53% |
| 3Q 2016 | ($101,826) | ($213,267) | ($2.82) | ($5.90) | 52% |
| FY 2016 | ($529,158) | ($833,858) | ($14.71) | ($23.18) | 37% |

80. Also as a result of the Restatement, the Company's management evaluated Walter's ability to continue as a going concern as of the date of the Restatement and determined that "there is substantial doubt as to [Walter's] ability to continue as a going concern." The Restatement further explained that:

> The Company is facing certain challenges and uncertainties that could have significant adverse effects on its business, liquidity and financing activities. The Company may be adversely impacted by the following factors, among others: failure to maintain sufficient liquidity to operate its servicing and lending businesses due to

> the inability to renew, replace or extend its advance financing or warehouse facilities on favorable terms, or at all; failure to comply with covenants contained in its debt agreements or obtain any necessary waivers or amendments; . . . and failure to successfully restructure its corporate debt.

81. The Restatement further explained that Walter needed, and was able to, obtain waivers and/or amendments of its debt agreements and warehousing and advance facilities as a result of, or in connection with, the Restatement and the Company's going concern notice. However, as a result of these waivers and/or amendments, Walter's available liquidity and capital resources were further negatively impacted.

82. Lastly, as a result of the Restatement, "RMS was not in compliance with certain financial covenants required by Ginnie Mae and Fannie Mae" as of June 30, 2016, September 30, 2016, and December 31, 2016. In the Restatement, Defendants reported that for the year ended December 31, 2016, RMS was required to maintain an adjusted net worth, its most restrictive covenant exclusive of previous waivers Walter received, of $108.6 million. Prior to the Restatement, Defendants reported that RMS's actual adjusted net worth was $118.4 million. However, as reported in the Restatement, RMS's actual adjusted net worth was only $51.3 million, less than half of the required covenant.

**D. Defendants Were, At Minimum, Deliberately Reckless In Their Valuation Allowance Assessment For Walter's Reported Deferred Tax Assets**

83. Defendants confirmed that Walter performed a valuation allowance assessment every financial period. On the first day of the Class Period, during Walter's earnings call with investors and analysts, Defendant Tillett fielded a question regarding Walter's deferred tax assets, demonstrating his knowledge and participation in determining the valuation allowance for Walter's deferred tax asset balance:

> BOSE GEORGE: Okay. Actually switching to the deferred tax asset, continues to grow. It looks like it is around $7.50 a share now. Is there anything that could trigger the need to take a valuation allowance? . . . .

> GARY TILLETT: Yes, I think first of all, the deferred tax asset, as you know, ***we basically have to evaluate each period against your future taxable income*** and what would trigger that is if you believe that it became not more likely than not that you believe you will realize it. So that is what would trigger a valuation allowance and we felt like in the foreseeable future we wouldn't generate the taxable income to offset that. (Emphasis supplied).

84. Defendant Tillett again answered another question from an analyst regarding Walter's potential need to take a valuation allowance against its deferred tax assets during Walter's November 9, 2016 earnings call:

> FRED SMALL: . . . . And then is there a timeline where you need to achieve ability at some point to avoid taking a valuation allowance against the DTA?
>
> GARY TILLETT: If you think about the DTA we look at our forecast and expectations of profitability over time. And you do that, you have the tax code which affects net operating losses. We have a small part of NOL. Most of our DTA is timing differences so you have a significant timeline, ***but as you follow GAAP and do your estimates, you do dial that back to a few years. You don't go out long-term.***
>
> * * * *
>
> GARY TILLETT: I wouldn't say there is a specific timeline that the servicer or something has to get back to profitability by a specific timeline. ***But as you look at the aggregate forecast of the business,*** even though the tax code would give you 20 years, ***you clearly don't go that far in terms of your calculation. You don't go out that far.*** (Emphasis supplied).

85. Additionally, in the Company's 2016 Form 10-K, filed on March 14, 2017, Defendants further described their "periodic reviews of the carrying amount of our deferred tax assets to determine if the establishment of a valuation allowance is necessary . . . . A valuation allowance is required when it is more likely than not that all or a portion of a deferred tax asset will not be realized."

86. The 2016 Form 10-K further explained that "[i]tems considered in this analysis include the reversal of temporary differences, tax planning strategies, historical financial performance, expectations of future earnings, and the length of statutory carryforward periods.

Significant judgment is required in assessing future earnings trends and the timing of reversals of temporary differences."

87. Although Defendants' judgment is required in a valuation allowance assessment, as explained in PWC's November 2016 comprehensive guide on the accounting for income taxes,[5] the valuation allowance assessment "is at once subjective as well as mechanical."

88. Once the weight of all available evidence and the verifiability of that evidence has been assessed, the process of computing the valuation allowance is mechanical. The PWC guide explains that the "mechanical process is important and will have an impact when the weight of available evidence suggests that income in applicable future periods will be insufficient to support the realization of all deferred tax assets."

89. The Restatement resulted from a change in this mechanical process beginning in the second quarter of 2016, or shortly thereafter in the process of reporting the financial results for this quarter. Defendants explained that the Restatement "result[ed] from an ***error in the calculation*** of the valuation allowance on the net deferred tax assets balance." (Emphasis supplied). More specifically, "[i]n determining the amount of the valuation allowance . . . , an error was made that resulted in the ***double-counting of expected future taxable income*** associated with the projected reversals of taxable temporary differences." (Emphasis supplied).

90. Thus, the Restatement did not stem from a change in management's judgment. In fact, Defendants specifically noted in the Restatement that the "judgments and estimates made at the time of the Original Filing[s], using then-available facts and circumstances, are considered to be reasonable and appropriate[.]"

[5] Available at https://www.pwc.com/us/en/cfodirect/assets/pdf/accounting-guides/pwc-income-taxes-guide.pdf.

91. Rather, the Restatement resulted from the mechanical process or formula Defendants' used in determining whether a valuation allowance is needed. Essentially, based on the explanation provided by Defendants in the Restatement, beginning sometime during the second quarter of 2016, or around when the second quarter of 2016 financial results were reported, the mechanical process or formula Defendants used to determine if a valuation allowance was necessary began to double-count Walter's estimated future taxable income. It was this double-counting that resulted in the conclusion that a valuation allowance was not needed for Walter's deferred net tax assets during the Class Period.

92. However, the PWC guide acknowledges that although formulas may be a good starting point to determine the valuation allowance as a technique to "organize the thought process for evaluating the need for a valuation allowance, but they are not a substitute for reasoned judgment."

93. Furthermore, under GAAP, "[f]orming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years." Although an entity is required to use judgment in considering the impact of negative and positive evidence, the weight given to the potential effect of such evidence "shall be commensurate with the extent to which it can be objectively verified."

94. Relevant GAAP authority further explains that "[t]he more negative evidence that exists, the more positive evidence is necessary and the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset. ***A cumulative loss in recent years is a significant piece of negative evidence that is difficult to overcome***."

95. The existence of significant negative evidence for Walter was undeniable. At the time Defendants began double-counting Walter's expected future taxable income, Walter continued to be plagued with decreasing revenues and increasing costs, resulting in significant net losses for the Company. Walter reported its ninth straight quarter of GAAP losses in the second quarter of 2016 on August 9, 2016 and reported additional GAAP losses in the third and fourth quarters of 2016, resulting in 11 straight quarters of losses for the Company.

96. In contrast, during the 2016 fiscal year, Walter's net deferred tax assets grew by $191.9 million as a result of the Company's operating loss for the year, "and the impact of deductible goodwill impairment related to the Servicing and [Asset Receivables Management] reporting units."

97. The large goodwill impairments occurred at the same time that Defendants reported an increase of $125.6 million in Walter's net deferred tax assets in the second quarter of 2016 financial results and $152.06 million in the third quarter of 2016 financial results. During these same two quarters, Walter reported a goodwill impairment of $215.4 million relating to the Servicing and Asset Receivables Management units and $91 million to the Servicing unit, respectively.

98. Thus, Defendants were confronted with significant negative evidence that should be "difficult to overcome," but was instead used to explain the cause of the increase to the deferred tax asset balance, including: (1) eleven consecutive quarters of reported GAAP losses for the Company, and (2) Defendants' explicit determination that the deteriorating business conditions in the Servicing and Asset Recovery Management units warranted a total goodwill impairment of over $300 million dollars.

99. Thus, throughout the Class Period, Defendants continued to report deferred tax assets at much higher balance than the actual evidence supported, because, as admitted by Defendant Tillett

on the August 9, 2016 earnings conference call, Defendants' focus when determining the valuation allowance was evaluating the deferred tax asset balances against future taxable income.

100. Defendant Tillett's admission was telling and displays that Defendants were, at minimum, deliberately reckless in accounting for Walter's deferred tax assets. Either (1) Defendants ignored or did not give Walter's negative evidence, including Walter's difficult-to-overcome evidence of recent cumulative losses, the proper weight GAAP requires; (2) Defendants too heavily relied on Walter's faulty valuation allowance mechanical process or formula in making the valuation allowance determination; or (3) Defendants did both.

101. Such deliberate recklessness, if not knowledge, of the failure to properly account for Walter's deferred tax assets is demonstrated by the large goodwill impairments Defendants determined were prudent to record. Defendants explained that the large goodwill impairment taken in the second quarter and third quarters of 2016 – when Defendants began to double-count future taxable income – was driven by: a drop in cash flows from "lower than expected operating results and "unsuccessful development of new business opportunities[;]" "external pressures that the sector continues to experience, including regulatory scrutiny and market volatility due to the declining interest rate environment[;]" "downward pressures on the Company's share price during the first half of 2016[;]" and "a continuation of higher expense levels in the near term due to anticipated infrastructure investments and lower cash flows."

102. Not only should Defendants have explicitly and carefully considered whether the $125.6 million and $152.06 million increases to Walter's deferred tax asset balances in the second and third quarters had become so large that Walter would actually be able to recover such large deferred tax asset balances, but in these two quarters, Defendants carefully analyzed negative

evidence that would indicate the need for a valuation allowance to deferred tax assets, and used this evidence to determine that over $300 million in goodwill impairments was prudent and necessary.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

103. During the Class Period, Walter filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and an Annual Report on Form 10-K, containing the Company's reported financial statements. The following chart identifies the date, signatories, and period covered by each report:

| WALTER'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| *FORM* | *PERIOD* | *DATE FILED* | *SIGNATORIES* | *REFERRED TO BELOW AS* |
| 10-Q | 2016 Fiscal 2nd Quarter | 8/9/2016 | Defendants Awad and Tillett | 2Q 2016 10-Q |
| 10-Q | 2016 Fiscal 3rd Quarter | 11/9/2016 | Defendants Renzi and Tillett | 3Q 2016 10-Q |
| 10-K | 2016 Fiscal 4th Quarter and Year | 3/14/2017 | Defendants Awad, Renzi, and Tillett | 2016 10-K |
| 10-Q | 2017 Fiscal 1st Quarter | 5/10/2017 | Defendants Renzi and Tillett | 1Q 2017 10-Q |

104. As reflected by the chart below, during the Class Period, Walter issued the following press releases announcing its financial and operating results, which were attached to Form 8-Ks filed with the SEC by the Company and were signed by Defendant Tillett. These press releases contained financial statements as was included in the Company's periodic reports:

| **PRESS RELEASES ISSUED BY WALTER DURING THE CLASS PERIOD ANNOUNCING THE COMPANY'S FINANCIAL RESULTS** | | |
|---|---|---|
| *PERIOD* | *DATE* | *REFERRED TO BELOW AS* |
| 2016 Fiscal 2nd Quarter | 8/9/2016 | 2Q 2016 PR |
| 2016 Fiscal 3rd Quarter | 11/9/2016 | 3Q 2016 PR |
| 2016 Fiscal 4th Quarter and Year | 3/14/2017 | FY 2016 PR |
| 2016 Fiscal 1st Quarter | 5/10/2017 | 1Q 2017 PR |

105. During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Walter's SEC filings and during its investor conference calls.

**A. Defendants' False and Misleading Statements in the Disclosure of Walter's Second Quarter of 2016 Financial Results**

106. The Class Period begins on August 9, 2016. On that date, Walter issued its 2Q 2016 10-Q and 2Q 2016 PR in which the Company reported a deferred tax asset balance of $273.82 million and a stockholders' equity balance of $403.38 million as of June 30, 2016, as well as a net loss of $232.4 million for the quarter ended June 30, 2016. In the Earnings Presentation, also attached to the Form 8-K filed with the SEC on August 9, 2016 and signed by Defendant Tillett, the Company reported a book value per share of $11.16. Also on that day, Defendants Awad and Tillett participated in a quarterly conference call with analysts, during which Defendant Awad reiterated that for the second quarter of 2016, Walter reported a net loss of $232.4 million.

107. As disclosed in the Restatement, Walter's 2016 second quarter reported deferred tax asset and stockholders' equity balances were materially misstated in Walter's 2Q 2016 10-Q and 2Q 2016 PR by overstating the deferred tax asset and stockholders' equity balances both by $257.56 million. The deferred tax asset balance was overstated by almost 16 times the restated value, from the $273.82 million originally reported to just $16.25 million reported in the restated financials. The stockholders' equity balance was overstated by 177%, from the $403.38 million originally reported to just $145.82 million reported in the restated financials. The Restatement also disclosed that the

Company's 2016 second quarter reported net loss was materially misstated in Walter's 2Q 2016 10-Q, 2Q 2016 PR, and on the August 9, 2016 earnings conference call by understating net loss by $257.56 million, or 53%, from the $232.4 million net loss originally reported to a restated net loss of $489.96 million. Similarly, the reported book value per share reported in Walter's second quarter of 2016 Earnings Presentation was overstated by 177%, or $7.12 per share, from the original reported book value per share of $11.16 to just $4.04, as calculated from the restated shareholders' equity balances and reported shares outstanding as of June 30, 2016.

108. The 2Q 2016 10-Q also discussed the financial covenants related to minimum levels of net worth and other financial requirements that the Company was required to comply with as part of their agreements with the GSEs and Ginnie Mae, concluding that: "After taking into account the waivers for RMS . . . , all of our subsidiaries were in compliance with all of their capital requirements at June 30, 2016."

109. As disclosed in the Restatement, the conclusion in the preceding paragraph was materially false and misleading and omitted material information because as a result of the Restatement, "RMS was not in compliance with certain financial covenants required by Ginnie Mae and Fannie Mae as of June 30, 2016."

110. Defendants Awad and Tillett were, at minimum, deliberately reckless in disregarding that the statements in paragraphs 106 and 108 were materially false and misleading when made and omitted material information because the statements failed to properly disclose that the Company was improperly "double-counting [] expected future taxable income associated with the projected reversals of taxable temporary differences" in calculating the valuation allowance on the deferred tax assets balance. Correspondingly, Walter's deferred tax asset and stockholders' equity balances and its book value per share metric were materially overstated and Walter's net loss was materially

understated as admitted by the Company in their August 9, 2017 restatement. Similarly, as a result of this improper double-counting, Walter and its RMS subsidiary were not in compliance with certain required financial covenants.

**B. Defendants' False and Misleading Statements in the Disclosure of Walter's Third Quarter of 2016 Financial Results**

111. On November 9, 2016, Walter issued its 3Q 2016 10-Q and 3Q 2016 PR in which the Company reported a deferred tax asset balance of $425.88 million and a stockholders' equity balance of $303.47 million as of September 30, 2016, as well as a net loss of $101.83 million for the quarter ended September 30, 2016. In the Earnings Presentation, also attached to the Form 8-K filed with the SEC on November 9, 2016 and signed by Defendant Tillett, the Company reported a book value per share of $8.36. Also on that day, Defendants Renzi and Tillett participated in a quarterly conference call with analysts, during which both Defendants Renzi and Tillett reiterated that for the third quarter of 2016, Walter reported a net loss of $101.8 million.

112. As disclosed in the Restatement, Walter's 2016 third quarter reported deferred tax asset and stockholders' equity balances were materially misstated in Walter's 3Q 2016 10-Q and 3Q 2016 PR by overstating the deferred tax asset and stockholders' equity balances both by $369 million. The deferred tax asset balance was overstated by over 6 times the restated value, from the $425.88 million originally reported to just $56.88 million reported in the restated financials. The stockholders' equity balance was overstated by almost 6 times the restated value, from the $303.47 million originally reported to a negative balance of $65.54 million reported in the restated financials, *i.e.*, a stockholders' deficit balance of $65.54 million. The Restatement also disclosed that the Company's 2016 third quarter reported net loss was materially misstated in Walter's 3Q 2016 10-Q, 3Q 2016 PR, and on the November 9, 2016 earnings conference call by understating net loss by $111.44 million, or 52%, from the $101.83 million net loss originally reported to a restated net loss

of $213.27 million. Similarly, the reported book value per share reported in Walter's third quarter of 2016 Earnings Presentation was overstated by 563%, or $10.16 per share, from the original reported book value per share of $8.36 to -$1.80, as calculated from the restated shareholders' equity balances and reported shares outstanding as of September 30, 2016.

113. The 3Q 2016 10-Q also discussed the financial covenants related to minimum levels of net worth and other financial requirements that the Company was required to comply with as part of their agreements with the GSEs and Ginnie Mae, concluding that: "After taking into account the waivers for RMS . . . , all of our subsidiaries were in compliance with all of their capital requirements at September 30, 2016."

114. As disclosed in the Restatement, the conclusion in the preceding paragraph was materially false and misleading and omitted material information because as a result of the Restatement, "RMS was not in compliance with certain financial covenants required by Ginnie Mae and Fannie Mae as of September 30, 2016."

115. Defendants Renzi and Tillett were, at minimum, deliberately reckless in disregarding that the statements in paragraphs 111 and 113 were materially false and misleading when made and omitted material information because the statements failed to properly disclose that the Company was improperly "double-counting [] expected future taxable income associated with the projected reversals of taxable temporary differences" in calculating the valuation allowance on the deferred tax assets balance. Correspondingly, Walter's deferred tax asset and stockholders' equity balances and its book value per share metric were materially overstated and Walter's net loss was materially understated as admitted by the Company in their August 9, 2017 restatement. Similarly, as a result of this improper double-counting, Walter and its RMS subsidiary were not in compliance with certain required financial covenants.

**C. Defendants' False and Misleading Statements in the Disclosure of Walter's 2016 Fiscal Year Financial Results**

116. On March 14, 2017, Walter issued its 2016 10-K and FY 2016 PR in which the Company reported a deferred tax asset balance of $299.93 million and a stockholders' equity balance of $280.26 million as of December 31, 2016, as well as a net loss of $529.16 million for the year ended December 31, 2016. In the Earnings Presentation, also attached to the Form 8-K filed with the SEC on March 14, 2017 and signed by Defendant Tillett, the Company reported a book value per share of $7.70. Also on that day, Defendants Renzi and Tillett participated in a quarterly conference call with analysts, during which Defendant Renzi reiterated that for the 2016 fiscal year, Walter reported a net loss of $529.2 million.

117. As disclosed in the Restatement, Walter's 2016 fiscal year reported deferred tax asset and stockholders' equity balances were materially misstated in Walter's 2016 10-K and FY 2016 PR by overstating the deferred tax asset and stockholders' equity balances both by $304.7 million. The deferred tax asset balance was restated to a deferred tax ***liability*** of $4.77 million, from the $299.93 million deferred tax asset balance originally reported – a 6,382% overstatement. The stockholders' equity balance was similarly restated to a stockholders' deficit of $24.44 million – a -$24.44 million balance in stockholders' equity – from the $280.26 million stockholders' equity balance originally reported – a 1,247% overstatement. The Restatement also disclosed that the Company's 2016 third quarter reported net loss was materially misstated in Walter's 2016 10-K, FY 2016 PR, and on the March 14, 2017 earnings conference call by understating net loss by $304.7 million, or 37%, from the $529.16 million net loss originally reported to a restated net loss of $833.86 million. Similarly, the reported book value per share reported in Walter's fiscal year of 2016 Earnings Presentation was overstated by 1,247%, or $8.37 per share, from the original reported book value per share of $7.70 to

-$0.67, as calculated from the restated shareholders' equity balances and reported shares outstanding as of December 31, 2016.

118. The 2016 10-K also discussed the financial covenants related to minimum levels of net worth and other financial requirements that the Company was required to comply with as part of their agreements with the GSEs and Ginnie Mae, concluding that: "After taking into account the waivers for RMS . . . , all of our subsidiaries were in compliance with all of their capital requirements at December 31, 2016." Additionally, Note 30 to the 2016 10-K provided a table with the required and actual adjusted net worth of both Ditech and RMS for the most restrictive covenant, excluding covenants for which Walter has waivers (in thousands):

| | December 31, 2016 | |
|---|---|---|
| | Required Adjusted Net Worth | Actual Adjusted Net Worth |
| Ditech Financial | $ 492,013 | $ 1,595,377 |
| Reverse Mortgage Solutions | 108,617 | 118,420 |

119. As disclosed in the Restatement, the conclusion in the preceding paragraph was materially false and misleading and omitted material information because as a result of the Restatement, "RMS was not in compliance with certain financial covenants required by Ginnie Mae and Fannie Mae as of December 31, 2016 and for the quarters ended June 30, 2016 and September 30, 2016." The Restatement also disclosed the RMS's actual adjusted net worth was materially misstated in Walter's 2016 10-K by overstating the actual adjusted net worth. The restated actual adjusted net worth balance was overstated by $67.11 million, or 131%, from the originally reported actual adjusted net worth balance of $118.42 million for RMS to a restated actual adjusted net worth balance of $51.31 million. This restated balance was well below the required adjusted net worth for its most restrictive covenant, and was below its required adjusted net worth by 112%, or $57.31 million.

120. Defendants Awad, Renzi and Tillett were, at minimum, deliberately reckless in disregarding that the statements in paragraphs 116 and 118 were materially false and misleading when made and omitted material information because the statements failed to properly disclose that the Company was improperly "double-counting [] expected future taxable income associated with the projected reversals of taxable temporary differences" in calculating the valuation allowance on the deferred tax assets balance. Correspondingly, Walter's deferred tax asset and stockholders' equity balances and its book value per share metric were materially overstated and Walter's net loss was materially understated as admitted by the Company in their August 9, 2017 restatement. Similarly, as a result of this improper double-counting, Walter and its RMS subsidiary were not in compliance with certain financial covenants, including RMS's most restrictive covenant, required adjusted net worth, which was additionally materially misstated.

**D. Defendants' False and Misleading Statements in the Disclosure of Walter's First Quarter of 2017 Financial Results**

121. On May 10, 2017, Walter issued its 1Q 2017 10-Q and 1Q 2017 PR in which the Company reported a deferred tax asset balance of $299.63 million and a stockholders' equity balance of $282.97 million as of March 31, 2017. In the Earnings Presentation, also attached to the Form 8-K filed with the SEC on May 10, 2017 and signed by Defendant Tillett, the Company reported a book value per share of $7.76.

122. As disclosed in the Restatement, Walter's 2017 first quarter reported deferred tax asset and stockholders' equity balances were materially misstated in Walter's 1Q 2017 10-Q and 1Q 2017 PR by overstating the deferred tax asset balance by $302.53 million, or 10,428%, and stockholders' equity balance by $302.08 million, or 1,581%. The deferred tax asset balance was restated to a deferred tax ***liability*** of $2.9 million, from the originally reported $299.63 million deferred tax asset. The stockholders' equity balance was similarly restated to a stockholders' deficit

of $19.11 million – or, a -$19.11 million balance in stockholders' equity – from the $282.97 million stockholders' equity balance originally reported. Similarly, the reported book value per share reported in Walter's first quarter of 2017 Earnings Presentation was overstated by 1,581%, or $8.28 per share, from the original reported book value per share of $7.76 to -$0.52, as calculated from the restated shareholders' equity balances and reported shares outstanding as of March 31, 2017.

123. Defendants Renzi and Tillett were, at minimum, deliberately reckless in disregarding that the statements in paragraph 121 were materially false and misleading when made and omitted material information because the financial statements failed to properly disclose that the Company was improperly "double-counting [] expected future taxable income associated with the projected reversals of taxable temporary differences" in calculating the valuation allowance on the deferred tax assets balance. Correspondingly, Walter's deferred tax asset and stockholders' equity balances and its book value per share metric were materially overstated as admitted by the Company in their August 9, 2017 restatement.

**E. The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications**

124. SOX requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing.

125. Each of Walter's 2Q 2016 10-Q, 3Q 2016 10-Q, 2016 10-K, and 1Q 2017 10-Q contained certifications pursuant to Section 302, signed by Defendants Awad and Tillett in the 2Q 2016 10-Q, and by Defendants Renzi and Tillett in the 3Q 2016 10-Q, 2016 10-K, and 1Q 2017 10-Q, certifying that:

> 1. I have reviewed this Quarterly Report on Form 10-Q of Walter Investment Management Corp. (the "Registrant") . . .;

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

> a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared;
>
> b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and
>
> d) disclosed in this Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

> a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

> b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

126. Pursuant to Section 906 of SOX, Defendants Awad and Tillett, in the 2Q 2016 10-Q, and Defendants Renzi and Tillett, in the 3Q 2016 10-Q, 2016 10-K, and 1Q 2017 10-Q, further certified that:

> 1. The [Report] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

127. As admitted in the Restatement, the statements set forth in the paragraphs 125 and 126 were materially false and misleading when issued. Contrary to Defendants Awad, Renzi, and Tillett's certifications that Walter's internal controls over financial reporting were "effective" and were designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," as part of the Restatement Defendants Renzi and Tillett determined that the Company's disclosure controls and procedures were not effective as of June 30, 2016, September 30, 2016, December 31, 2016, and March 31, 2017:

> Subsequent to the above evaluation in the Original Filing, the Chief Executive Officer and Chief Financial Officer determined that the Company also did not have adequate controls operating effectively to ensure that it correctly calculated its deferred tax asset valuation allowance, including having adequate technical review of the deferred tax asset valuation allowance . . . . The Company determined that there was an error in the calculation of the valuation allowance for federal deferred tax assets related to an ineffective review of the tax calculations associated with the valuation allowance on the deferred tax asset balance. This resulted in an error requiring the Company to restate its financial statements[.]
>
> * * *
>
> Management has determined that the Company did not maintain effective internal controls with respect to the operating effectiveness of the review of the tax calculations associated with the valuation allowance on the deferred tax asset

> balances on an annual or quarterly basis. . . . Accordingly, management determined that this control deficiency constitutes a material weakness.

## VII. Defendants' Violations of GAAP Resulted in False and Misleading Financial Statements

128. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

129. Each of Walter's financial statements issued during the Class Period, as well as the financial results that were derived from those financial statements discussed in the quarterly and annual SEC filings and in the Company's press releases, including the 2Q 2016 PR, 3Q 2016 PR, FY 2016 PR, and 1Q 2017 PR, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

130. Defendants represented to investors during the Class Period that Walter's financial statements were prepared in accordance with GAAP—representations highly material to the total mix of information available for investors' evaluation of whether or not to purchase Walter securities.

131. Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Walter and the Individual Defendants to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4- 01(a)(1).

132. During the Class Period, certain of Walter's financial statements violated GAAP, rendering them materially false and misleading. The 2Q 2016 10-Q, 3Q 2016 10-Q, FY 2016 10-K, and 1Q 2017 10-Q financial statements, as well as the financial results that were derived from those

financial statements discussed in these SEC filings and in the Company's press releases, including the 2Q 2016 PR, 3Q 2016 PR, FY 2016 PR, and 1Q 2017 PR, were rendered false and misleading due to Defendants' failure to comply with SEC rules and GAAP.

133. Furthermore, the fact that Walter restated its financial statements and disclosed that its financial statements issued during the Class Period should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion No. 20 at ¶¶7-13; Financial Accounting Standards Board Statement No. 154 at ¶25).

134. The financial statements and financial results listed above in paragraphs 129 and 132 violated GAAP, rendering them materially false and misleading because Walter failed to properly calculate and assess the need for a valuation allowance on Walter's net deferred tax assets balance in these financial statements.

135. Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. (ASC 105-10-05-1).

136. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP,

with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. §210.10-01(a)).

137. ASC Topic 740-10-30, Income Taxes, Initial Measurement ("ASC 740-10-30"), provides "guidance focuse[d] on the initial measurement of deferred tax assets and liabilities . . . . [and] also addresses the consideration and establishment of a valuation allowance for deferred tax assets[,]" among others.

138. ASC 740-10-30-2(b) requires that measurement of deferred tax assets be "reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized."

139. ASC-740-10-30-21 further states that "Forming a conclusion that a valuation allowance is not needed is difficult when there is negative evidence such as cumulative losses in recent years. Other examples of negative evidence include, but are not limited to, the following: . . . [a] history of operating loss[;]" and "[u]nsettled circumstances that, if unfavorably resolved, would adversely affect future operations and profit levels on a continuing basis in future years[.]"

140. ASC-740-10-30-23 additionally states that "[a]n entity shall use judgment in considering the relative impact of negative and positive evidence. The weight given to the potential effect of negative and positive evidence shall be commensurate with the extent to which it can be objectively verified. The more negative evidence that exists, the more positive evidence is necessary and the more difficult it is to support a conclusion that a valuation allowance is not needed for some portion or all of the deferred tax asset. A cumulative loss in recent years is a significant piece of negative evidence that is difficult to overcome."

141. Further, each registrant with securities registered pursuant to Section 12 of the Exchange Act must make and keep books, records, and accounts, which, in reasonable detail,

accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

142. For the reasons set forth in sections V.A and V.D, *supra*, due to Defendants' failure to apply these basic accounting principles and reduce Walter's deferred tax assets through a proper valuation allowance in violation of GAAP, Walter's publicly disclosed financial statements during the Class Period were prepared in violation of GAAP rule ASC 740-10-30, et seq. Therefore, the financial statements that Walter publicly issued during the Class Period were not prepared in conformity with GAAP.

## VIII. LOSS CAUSATION

143. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

144. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and other Class members.

145. During the Class Period, Plaintiff and other Class members purchased or acquired Walter securities at artificially inflated prices in reliance on Defendants' material misrepresentations and omissions. The price of those securities declined significantly on heavy trading volume when information disclosed to the market for the first time was partially revealed and/or the concealed risks materialized on or about: March 14, 2017; May 26, 2017; and August 1, 2017. During the Class Period, investors and analysts were focused on Defendants' ability to de-lever Walter's balance sheet and, correspondingly, the remaining shareholders' value of the Company, as commonly measured by the book value and tangible book value per share.

146. On March 14, 2017, Walter announced its fourth quarter and 2016 fiscal results in its FY 2016 PR and the 2016 10-K. In the press release, for the first time, Defendants announced Walter's "debt restructuring initiative," explaining that they "have engaged Weil, Gotshal & Manges LLP and Houlihan Lokey to assist us in reviewing a number of potential actions we may take to reduce our leverage." In Walter's 2016 10-K, Defendants further explained that the advisors they had engaged were "legal and debt restructuring advisors." Later that day, during the pre-recorded earnings call, Defendant Renzi repeated this announcement.

147. On this news, the price of Walter's stock fell almost 39%, or $1.05 per share, to close at $1.65 on March 14, 2017, on extremely heavy trading volume. Walter's stock continued to fall over the next seven trading days, cumulatively falling an additional $0.95 per share, or almost 58%, from the close of $1.65 on March 14, 2017 to close at $0.70 on March 23, 2017.

148. The March 14, 2017 announcement partially revealed that Defendants' efforts to reduce Walter's leverage may include some sort of debt restructuring initiatives and the possibility of shareholder dilution. However, the March 14, 2017 announcement failed to disclose, among other things, the full extent of Defendants' restructuring efforts, or that Defendants were materially overstating Walter's deferred tax asset balances, which had the effect of materially overstating Walter's shareholder's equity, book value, and tangible book value per share, important metrics to investors and analysts. Indeed, a Compass Point analyst was quoted in a March 14, 2017 Bloomberg article as commenting that the "[i]ncrease to tangible book value may be 'silver lining,' if there is one" in discussing Walter's financial results for the 2016 fiscal year and the hiring of counsel "to help review actions to cut leverage."

149. The significance of the March 14, 2017 announcement is illustrated in analysts' commentary. For instance, in a research report published by Credit Suisse on March 14, 2017, Credit

Suisse noted that it was lowering its target price for Walter to $2, from $5, explaining that one of the key risks to the lowered target price stemmed from the possible debt restructuring. Compass Point similarly lowered its price target for Walter to $0.50 from a previous price target of $2.50, commenting that "deleveraging the balance sheet continues to prove more difficult than WAC management anticipated" in its March 16, 2017 report. In explaining its price target for Walter, the Compass Point analysts noted that their upside scenario "may be optimistic given the profitability challenges and the possibility of further valuation allowance against the DTA."

150. Compass Point analysts further noted that following Defendants' announcement of hiring debt restructuring advisors "to reduce Walter's leverage, the probability of significant shareholder dilution has increased." In its March 16, 2017 report, Barclays began its report with the following headline:

> **Debt levels are a serious concern:** In the release, management noted that WAC has hired Weil, GOTSHAL & Manges LLP and Houlihan Lokey to work on debt restructuring. WAC noted that it relies on capital markets on a daily basis and it also needs access to those markets to refinance its corporate debt, which stood at $2.1bn at 4Q. No other details were provided related to these restructuring efforts, but it's clear that WAC's capital position is a serious concern not just to investors.

151. On May 26, 2017, after the close of market, Walter filed a Form 8-K with the SEC. In the Form 8-K, Walter announced that:

> On May 26, 2017, management of the Company, after consultation with Ernst & Young LLP ("EY"), the Company's independent registered public accounting firm, concluded that, due to an accounting error, as described below, the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and the previously issued unaudited consolidated financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended June 30, 2016, September 30, 2016 and March 31, 2017 (the "Original Filings") should no longer be relied upon. The Audit Committee of the Board of Directors of the Company, acting on the recommendations of management and after consultation with EY, also concluded that, due to such accounting error, the previously issued audited and unaudited consolidated financial statements and other financial information contained in the Original Filings should

> no longer be relied upon. Similarly, related earnings releases and other financial communications for these periods should no longer be relied upon.
>
> The Company has become aware of an error in the calculation of the valuation allowance on the deferred tax asset balances in the Original Filings. The Company's methodology effectively resulted in a duplication of the reversal of taxable temporary differences. Accordingly, the Company is in the process of revising its calculation to eliminate the duplication.
>
> Although the Company has not determined the precise amount of the adjustments to the valuation allowance on the deferred tax asset balances included in the Original Filings, such amounts are anticipated to be material. The Company's net deferred tax asset balances were $273.8 million as of June 30, 2016, $425.9 million as of September 30, 2016, $299.9 million as of December 31, 2016, and $299.6 million as of March 31, 2017. The impact of these adjustments will be to materially reduce the overall net deferred tax asset balances by increasing the valuation allowance, and reducing the tax benefit recorded in the Company's previously issued consolidated statements of comprehensive loss.
>
> * * *
>
> The Company has reassessed the Company's internal control over financial reporting and disclosure controls and procedures in light of the error. The Company has determined that a material weakness relating to the ineffective review of the tax calculations associated with the valuation allowance on the deferred tax asset balances existed for the affected periods, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures were ineffective. Further details and remediation plans will be reflected in the amended filings.
>
> * * *
>
> The need to restate the Company's financial statements will require that the Company seek appropriate amendments, waivers and / or forbearances to a number of its and its subsidiaries' credit and financing arrangements, . . . and certain other agreements.

152. On this news, the price of Walter's stock fell over 21%, or $0.30 per share, to close at $1.11 on May 30, 3017, the first trading day after the May 26, 2017 announcement, on unusually heavy trading volume.

153. The significance of the May 26, 2017 announcement is illustrated in Compass Point's flash note on May 30, 2017. In this note, Compass Point explained that Walter's announcement "[o]n Friday after the close (and just before a long weekend to boot)," was important because

"WAC's $300M DTA ($8.22/share) compares with stated book value per share (BVPS) of $7.76 and tangible BVPS of $6.16 as of 1Q17. The anticipated restatement of the valuation allowance against the DTA will materially reduce the DTA." The analysts at Compass Point further explained that the implication of the announcement that "[t]he requirement for additional amendments or waivers from creditors due to the anticipated write-down of the DTA and the disclosed material weakness puts the equity in an even worse position[,]" explaining that Compass Point analysts estimated a 50% chance that Walter would ultimately file for bankruptcy, and even absent bankruptcy, they expected Walter "equity holders to experience significant dilution."

154. However, the May 26, 2017 announcement failed to disclose, among other things, the full extent of Defendants' restructuring efforts, whether the Company would be able to receive appropriate amendments and/or waiver's to its and its subsidiaries' credit and financing agreements, and what affect Defendants' restructuring efforts and need to obtain waivers and amendments relating to Walter's enormous outstanding indebtedness would have on Walter's equity holders.

155. On August 1, 2017, in a Form 8-K filed with the SEC after the close of market, Walter announced that on July 31, 2017, it had entered into the RSA with lenders holding more than 50% of Walter's 2013 Credit Agreement. As part of the RSA, the parties agreed to principal terms of a proposed financial restructuring that would take place out of official bankruptcy proceedings, and that if there was not sufficient stakeholder support, defined as at least 95% of the aggregate principal amount of the 2013 Term Loan, Senior Notes, and the Convertible Notes, then "a prepackaged plan of reorganization . . . under Title 11 of the United States Code" would occur. Under the restructuring plan, Walter will also plan to further issue equity to certain of its lenders. In reviewing the announcement, analysts from Credit Suisse explained that the RSA "will allow WAC to reduce its leverage and extend its maturities at the cost of dilution of existing holders."

156. Defendants also explained in this Form 8-K that certain events of default under the 2013 Term Loan and the Senior Notes were waived, including events of default relating to Walter needing to restate its financial statements, any "going concern" qualification delivered in connection with the forthcoming restatement, and any default or event of default that may arise as a result of the forthcoming restatement or any "going concern" qualification.

157. On this news, the price of Walter's stock fell almost 39%, or $0.32 per share, to close at $0.51 on August 2, 2017, on extremely heavy trading volume. Walter's stock continued to fall over the two trading days, falling an additional $0.11 per share, or 21.6%, from the close of $0.51 on August 2, 2017 to close at $0.40 on August 4, 2017.

158. The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's and the Class's damages were caused by Defendants' misrepresentations and omissions as alleged herein, and negate any inference that Plaintiff's and the Class's losses were the result of general market conditions or other factors unrelated to Defendants' misrepresentations and omissions alleged herein.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

159. The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the Company's overstatement of its deferred tax assets; and/or (b) their failure to properly assess the value of Walter's deferred tax assets; and/or (c) their intentional issuance of materially false or misleading financial statements which improperly overstated Walter's deferred tax assets; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

160. The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

161. In addition to the foregoing allegations, the following facts support a strong inference that Walter and the Individual Defendants knew, or with deliberate recklessness disregarded, that the challenged statements alleged herein were materially false or misleading when made.

**A. The Multitude of Government Investigations and Other Internal Control Weaknesses During, and Before, the Class Period Displays Walter's Lax Internal Control Environment**

162. Despite Defendants representation to investors that they maintained the highest level of oversight and strict internal controls over Walter's servicing protocols and procedures, and that they further maintained a high level of compliance with regulatory and legal requirements, the multitude of federal government investigations and the Company's past determined internal control weaknesses display otherwise. With Walter's past regulatory and internal control environment, the Individual Defendants were on notice of the careful attention that was required concerning the maintenance and supervision of the Company's controls and procedures over financial reporting.

163. On May 14, 2014 the Office of the Mortgage Settlement Oversight reported that Green Tree had failed 8 out of 28 compliance metrics relating to its servicing its loan portfolio.

164. In April 2015, Walter agreed to pay $63 million to settle an action brought against Green Tree by the CFPB for Green Tree's alleged mistreatment of mortgage borrowers. The CFPB alleged that Green Tree often overcharged customers, made payments to itself from customers' bank accounts without their authorization, and failed to investigate portfolio discrepancies despite being aware that they contained unreliable data.

165. On September 3, 2015, Walter settled a False Claims Act for $29.63 million in which Walter was alleged to have submitted false reverse mortgage claims to U.S. Department of Housing and Urban Development for debenture interest when Walter failed to properly disclose that it had not met certain deadlines (and thus was not entitled to debenture interest payments) and for reimbursement of unlawful referral fees by falsely representing them to be lawful sales commissions.

166. On December 7, 2016, RMS agreed to a consent order arising out of a CFPB investigation of RMS's marketing of reverse mortgage products and services. Under the order, RMS agreed to pay a $325,000 civil money penalty and agreed to injunctions against future violations of certain consumer protection statutes and regulations and agreed to establish and maintain a comprehensive compliance plan designed to ensure RMS's compliance with applicable consumer financial protection law and the full terms of the consent order.

167. Recently, the Office of Inspector General of the U.S. Department of Housing and Urban Development has been investigating RMS. On June 16, 2016 it issued a subpoena requiring RMS to produce documents and related materials relating to the origination, underwriting, and appraisal of reverse mortgages from January 1, 2005 onwards. A second subpoena was issued on January 12, 2017 and requested "certain documents and information relating to the origination and underwriting of certain specified loans." The investigation has also been coordinated with involvement from the U.S. Department of Justice, Civil Division. Defendants warned in the 2016 10-K that the investigation "could lead to a demand or claim under the False Claims Act[.]"

168. In addition, Walter regularly struggled to maintain adequate internal controls over its financial reporting. On March 18, 2013, the Company disclosed that management had discovered a "material weakness in our internal control over financial reporting" related to the improper capitalization of third party costs paid to investment bankers as arrangement fees associated with the

Company's acquisition of RMS, and, as a result, "our internal control over financial reporting was not effective."

169. Defendants also reported a different material weakness in Walter's internal controls over financial reporting in its 2016 10-K, relating to the operational processes associated with Ditech's default servicing activities. Defendants explained that "[s]pecifically, we did not design and maintain effective controls related to our ability to identify foreclosure tax liens and resolve such liens timely, foreclosure related advances, and the processing and oversight of loans in bankruptcy status." As a result, the design and operation of the Company's disclosure controls and procedures were not effective.

**B. The Individuals Defendants Were "Hands-On" Managers**

170. In announcing the hiring of Defendant Renzi as Walter's next CEO, Defendant Awad, then the Company's Chairman of the Board and Interim CEO, assured investors and analysts on Walter's August 9, 2016 earnings call that he would "continue to be involved in the organization and work closely alongside Tony in leading the organization." Defendant Awad was also quoted in the 2Q 2016 PR: "Process efficiencies have been a key focus of the Company, as we announced a company-wide process re-engineering initiative earlier this year that includes a comprehensive review of our cost structure and operations."

171. Shortly after Defendant Renzi's tenure began, the Company announced a "broad plan to realign the Company's management structure" designed to "flatten the organization with the intent of making it leaner and more effective" and "leaders of certain key operating units will now report directly to the Company's Chief Executive Officer and President, Anthony N. Renzi." In the 3Q 2016 PR, Renzi explained that he took quick action to focus Walter on, among others, operational fundamentals and "most importantly, execution and performance accountability." Renzi repeated these focuses on the November 9, 2016 earnings call.

172. Walter's former CEO, Mark O'Brien, explained in a January 30, 2014 press release that Defendant Tillett was hired in March 2014 in part to "drive improvement" in the "Company's finance, treasury, accounting and reporting functions[.]" In addition, Defendant Tillett received a $750,000 cash bonus for the fiscal year of 2016 – 1.5 times his 2016 salary of $500,000. In Walter's 2017 Proxy Statement to investors filed with the SEC on April 5, 2017, it was explained that Defendant Tillett was awarded this discretionary cash bonus in large part due to his "outstanding individual performance, particularly his exceptional leadership and increased level of responsibility while the Board of Directors searched for a permanent Chief Executive Officer and his substantial contribution in leading and executing a number of strategic transactions in 2016[.]"

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

173. The market for Walter's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Walter's securities traded at artificially inflated prices during the Class Period. On December 9, 2016, the Company's stock closed at a Class Period high of $7.35 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Walter's securities and market information relating to Walter, and have been damaged thereby.

174. During the Class Period, the artificial inflation of Walter's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Walter's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Walter and its business, operations, and prospects,

thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

175. At all relevant times, the market for Walter's securities was an efficient market for the following reasons, among others:

a. Walter stock was listed and actively traded on the NYSE, a highly efficient and automated market, under the ticker symbol "WAC";

b. As a regulated issuer, Walter filed periodic public reports with the SEC and/or the NYSE;

c. Walter regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Walter was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e. The average daily trading volume for Walter securities during the Class Period was approximately 572,302 shares, with over 36.5 million shares of stock outstanding as of June 30, 2017, and a market capitalization reaching approximately $266.97 million during the Class Period.

176. As a result of the foregoing, the market for Walter's securities promptly digested current information regarding Walter from all publicly available sources and reflected such information in Walter's stock price. Under these circumstances, all purchasers of Walter's securities during the Class Period suffered similar injury through their purchase of Walter's securities at artificially inflated prices and a presumption of reliance applies.

177. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

178. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

179. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

180. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Walter who knew that the statement was false when made.

## XII. CLASS ACTION ALLEGATIONS

181. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Walter's securities between August 9, 2016 through August 1, 2017, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

182. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Walter's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Walter shares were traded publicly during the Class Period on the NYSE. As of June 30, 2017, Walter had 36,541,904 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Walter or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

183. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

184. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

185. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Walter;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether the price of Walter securities were artificially inflated because of Defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the proper measure of damages.

186. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendant Walter and the Individual Defendants

187. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

188. During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Walter's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

189. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Walter's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

190. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about Walter's financial well-being and prospects, as specified herein.

191. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Walter's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Walter and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

192. Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

193. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Walter's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

194. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Walter's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Walter's securities during the Class Period at artificially high prices and were damaged thereby.

195. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Walter was

experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Walter securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

196. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

197. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

198. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

199. The Individual Defendants acted as controlling persons of Walter within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

200. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

201. As set forth above, Walter and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) declaring the action to be a proper class action pursuant to Fed. R. Civ. P. 23;

(b) awarding compensatory damages in favor of Plaintiff and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

(d) awarding equitable, injunctive, and other relief as the Court may deem just and proper.

## XV. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 15, 2017

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By: ______________________
Lee Albert (P.A. Bar ID 46852)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lalbert@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
info@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Class*