**GLANCY PRONGAY & MURRAY LLP**
Lee Albert (P.A. Bar ID 46852)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Lead Plaintiff Richard Worley
and the Proposed Settlement Class*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COURTNEY ELKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>  v.<br><br>WALTER INVESTMENT MANAGEMENT CORP., GEORGE M. AWAD, ANTHONY N. RENZI, and GARY L. TILLETT,<br><br>       Defendants. | Case No.: 2:17-cv-02025-JCJ<br><br>**DECLARATION OF LEE ALBERT IN SUPPORT OF (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT, CLASS CERTIFICATION, AND PLAN OF ALLOCATION, AND (II) PLAINTIFF'S COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     PROSECUTION OF THE ACTION .................................................................4

        A.    Factual Background .................................................................................4

        B.    Commencement Of The Instant Action ..................................................7

        C.    The Preparation And Filing Of The Complaint ......................................8

        D.    Defendants' Motion To Dismiss The Complaint And Lead Plaintiff's
              Opposition...............................................................................................10

        E.    WIMC's Bankruptcy And Lead Plaintiff's Successful Efforts In Negotiating
              A Carve-Out For The Claims In This Action .........................................12

        F.    Mediation Efforts And The Negotiation Of The Settlement .................13

        G.    Preliminary Approval Of The Settlement ..............................................14

III.    RISKS OF CONTINUED LITIGATION .........................................................15

        A.    Ability To Pay Risks..............................................................................15

        B.    Risks Of Proving Liability .....................................................................17

        C.    Risk Of Proving Loss Causation And Damages ....................................19

        D.    Other Risks.............................................................................................20

        E.    The Settlement Is Reasonable In Light Of The Potential Recovery In The
              Action.....................................................................................................21

IV.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE......................21

V.      ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT....................24

VI.     THE FEE AND LITIGATION APPLICATION...............................................26

        A.    The Fee Application................................................................................26

              1.    Lead Plaintiff Supports The Fee Application .............................27

              2.    The Work and Experience of Counsel ........................................27

      3.      Standing And Caliber Of Opposing Counsel..............................................30

      4.      The Risks Of Litigation And Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Securities Cases ...............30

      5.      The Reaction Of The Settlement To The Fee Application ........................32

   B.      The Litigation Expense Application ......................................................................32

VII.   CONCLUSION............................................................................................................35

## TABLE OF EXHIBITS TO DECLARATION

| EX. # | TITLE |
|---|---|
| 1 | Declaration of Eric A. Nordskog Regarding: (A) Mailing of the Notice and Proof of Claim and Release Form; (B) Publication of the Summary Notice; (C) Report on Requests for Exclusion Received to Date; and (D) Report on Volume of Claims Received to Date |
| 2 | Declaration of Richard Worley in Support of (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiff Richard Worley's Request for Reimbursement of Costs and Expenses |
| 3 | Chart of Law Firm Billing Rates |
| 4 | Declaration of Phillip Kim in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of the Rosen Law Firm |
| 5 | Glancy Prongay & Murray LLP Firm Resume |
| 6 | Cornerstone Research *Securities Class Action Settlements 2017 Review and Analysis* |
| 7 | *Sun v. Han*, No. 2:15-cv-00703-JMV-MF, slip op. (D.N.J. Mar. 6, 2018) |
| 8 | *Andavarapu v. iBio, Inc. et al.,* No. 1:14-cv-01343-RGA, slip op. (D. Del. Apr. 21, 2016) |

I, Lee Albert, Esq., declare as follows:

## I.    INTRODUCTION

1.     I am a partner at the law firm of Glancy Prongay & Murray LLP ("GPM").[1]  GPM ("Lead Counsel") represents the Court-appointed lead plaintiff, Richard Worley ("Lead Plaintiff") and the Settlement Class in the above-captioned securities class action lawsuit (the "Action").  I have personal knowledge of the matters set forth herein based on my active supervision of, and participation in, the prosecution and settlement of the claims asserted in the Action.

2.     I respectfully submit this Declaration in support of (a) Lead Plaintiff's Motion for Final Approval of Settlement, Class Certification, and Approval of Plan of Allocation; and (b) Plaintiff's Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee and Expense Application"), which respectfully requests an award of attorneys' fees in the amount of $33^1/_3$% of the Settlement Fund, and Litigation Expenses in the total amount of $99,333.53, consisting of Plaintiff's Counsel's[2] unreimbursed expenses in the amount of $89,333.53, and an award to Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") in the amount of $10,000 for his costs, including lost wages, incurred in connection with his representation of the Settlement Class.

3.     The proposed Settlement being presented to the Court for final approval provides for the resolution of all claims in the Action in exchange for a cash payment of $2.95 million.  As detailed herein, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement represents an excellent result for the Settlement Class in light of the significant risks in the Action.  As

---

[1] All capitalized terms that are not defined herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated July 13, 2018 (*see* ECF No. 47-5) (the "Stipulation"). The Court entered an Order Preliminarily Approving the Settlement and Providing for Notice on August 2, 2018.  ECF No. 49.

[2] Plaintiff's Counsel consists of Court-appointed Lead Counsel, GPM, and The Rosen Law Firm, P.A.

explained further below, the Settlement provides a considerable benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery, while at the same time avoiding the significant risks and expense of continued litigation, including the risk that the class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

4.     The proposed Settlement is the result of significant efforts by Lead Counsel.  Lead Counsel conducted an extensive investigation of the claims asserted in the Action, including a detailed review of Walter Investment Management Corporation's ("WIMC" or the "Company") Securities Exchange Commission ("SEC") filings, press releases, conference calls, news reports, and other public statements made by Defendants prior to, during, and after the Settlement Class Period.[3] Lead Counsel also conducted a detailed review and analysis of numerous other publicly available documents, including analyst reports, news articles, and court filings.  Finally, Lead Counsel consulted with experts in the areas of accounting, specifically about accounting for deferred tax assets, as well as loss causation and damages.

5.     Based on the foregoing, Lead Counsel: (a) prepared a detailed 61-page Amended Class Action Complaint (ECF No. 33, the "Complaint"); (b) opposed Defendants' motion to dismiss the Complaint (ECF Nos. 40, 43); and (c) engaged in a mediation process overseen by a highly experienced third-party mediator, Michelle Yoshida, Esq. of Phillips ADR, which involved written submissions concerning liability and damages, a full-day, in-person formal mediation session, consultations with Lead Plaintiff's damages expert, and weeks of follow-up negotiations.  The Parties ultimately finalized the Stipulation and Agreement of Settlement and submitted it to the Court along with Lead Plaintiff's Uncontested Motion for Preliminary Approval of Settlement ("Preliminary Approval Motion") on July 13, 2018.  *See* ECF No. 47.

---

[3] "Settlement Class Period" means the period between August 9, 2016 and August 1, 2017, inclusive.

6.    Lead Counsel also engaged bankruptcy counsel to file a limited objection to WIMC's voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq.*) (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to pursue a Prepackaged Chapter 11 Plan of Reorganization (the "Prepackaged Plan").[4]  That bankruptcy case was captioned *In re Walter Investment Management Corp.*, Case No. 17-13446.  Lead Plaintiff's limited objection was filed to make clear that Lead Plaintiff and the putative class were not subject to the Prepackaged Plan's release and that their claims were unaffected against the Individual Defendants by the Prepackaged Plan.  Subsequent negotiations between Lead Plaintiff's and WIMC's bankruptcy counsel resulted in an express carve out for Lead Plaintiff's and the putative class's claims in this Action from WIMC's Prepackaged Plan as modified.

7.    As a result of these foregoing efforts, Lead Plaintiff and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action and they believe the Settlement represents a favorable outcome of the Action and is in the best interests of the Settlement Class Members.

8.    As discussed in further detail below, the Plan of Allocation was developed with the assistance of Lead Plaintiff's damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court on a *pro rata* basis based on their losses attributable to the alleged fraud.

9.    With respect to the requested fees, as discussed in the Fee and Expense Application, the requested fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the requested fee results in a multiplier of 1.31 on

---

[4] WIMC is now known as Ditech Holding Corporation.

Plaintiff's Counsel's lodestar, which is likewise well within the range of multipliers routinely awarded by courts in this Circuit.

10.     For all of the reasons set forth herein and in the accompanying memoranda, including the quality of the result obtained and the numerous significant litigation risks discussed below, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" and should be approved.   In addition, Plaintiff's Counsel respectfully submits that their request for Attorneys' Fees and reimbursement of Litigation Expenses is also fair and reasonable, and should be approved.

## II.     PROSECUTION OF THE ACTION

### A.     Factual Background

11.     Defendant WIMC is a diversified mortgage banking firm that, during the Settlement Class Period, primarily originated and serviced mortgage loans, including reverse mortgages, for U.S. government-sponsored entities ("GSEs"), such as Ginnie Mae and Fannie Mae, and other credit owners.   During the Settlement Class Period, WIMC was headquartered in Fort Washington, Pennsylvania and its common stock was traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "WAC."

12.     WIMC grew rapidly in the early 2010s, expanding its business segments through numerous acquisitions and taking on massive debt to effectuate this expansion.   These acquisitions turned out to be far less successful than the Company anticipated, and WIMC reported its eleventh straight quarter of losses during the Settlement Class Period.

13.     As a result, during the Settlement Class Period, investors largely focused on the Company's ability to reduce its substantial debt, and correspondingly, maintaining what was left of WIMC's continually-shrinking stockholders' equity balance.   Stockholders' equity balance, or "book value," represents the net worth available to investors if the Company were to pay all its outstanding

4

debt.  Key financial metrics related to WIMC's stockholders' equity balances are (a) book value per share[5] and (b) tangible book value per share.[6]  These metrics were highly important to financial analysts during the Settlement Class Period, and many of the financial covenants imposed upon WIMC by the Company's creditors and GSEs required minimum tangible net worth and debt to tangible net worth ratio requirements.

14.     A significant portion of WIMC's stockholders' equity balance, and thus its book value per share and tangible book value per shares metrics, came from the Company's deferred tax asset balances.  Deferred tax assets ("DTA") represent the future positive effects on a company's income taxes on that company's balance sheet resulting from temporary differences[7] and carryforwards.[8]  Under U.S. generally accepted accounting principles ("GAAP"), a company may only carry DTA on its balance sheet if it expects to realize the DTA, *i.e.*, that the DTA can actually be used to reduce taxes payable in future years.  A valuation allowance, or reduction to a company's DTA, is required when a portion or all of a company's DTA are not expected to be realized.  GAAP further notes that cumulative losses in recent years makes it "difficult" to "[f]orm a conclusion that a valuation allowance is not needed."

15.     At the beginning of the Settlement Class Period, Defendants reported that WIMC had taken "solid steps" in its "capital efficiency efforts."  However, months later, in announcing WIMC's

---

[5] Book value per share is the stockholders' equity balance on a per share basis, which represents the dollar value remaining for each stockholder after all assets are liquidated and debts are repaid.

[6] Tangible book value per share measures the value of a company for its shareholders also on a per-share basis, but removes any intangible assets, such as goodwill, that cannot be sold upon a liquidation of a company.

[7] Temporary differences are the differences between a tax basis of an asset or liability and that asset or liability's reported amount in the financial statements that will result in a taxable or deductible amount in future years.

[8] Carryforwards are tax deductions or credits that cannot be utilized on a tax return during a current year that may be carried forward to reduce taxable income or taxes payable in a future year.

fourth quarter and fiscal year financial results for 2016 on March 14, 2017, Defendants reframed the Company's "capital efficiency efforts" as its "debt restructuring initiative."  This reframing of WIMC's debt management indicated to the market that WIMC's stockholders' equity balances were at risk.  On this news, shares of WIMC fell almost 39%, or $1.05 per share, on March 14, 2017.

16.     Just a couple months later, WIMC's stockholders' equity balances were again threatened, when on May 26, 2017 after the close of market, the Company announced that due to a material accounting error relating to part of the DTA valuation allowance calculation, its previous financial results for the second and third quarters of 2016, the fiscal year of 2016, and the first quarter of 2017, would need to be restated.  In addition, Defendants noted that due to the need to restate its financial results, WIMC would need to seek amendments, waivers, and/or forbearances on a number of its financial covenants.  These announcements indicated to the market that the Company's stockholders' equity balance was at risk of serious dilution.  In response to this announcement, WIMC's stock fell over 21%, or $0.30 per share, on the first trading day after the announcement.

17.     Then, on August 1, 2017, as part of Defendants efforts to obtain appropriate waivers and amendments to its financial covenants and debt agreements, WIMC announced that it had agreed to a proposed financial restructuring of the Company, coming at a substantial cost to stockholders' equity.  On this news, WIMC's stock fell over 39% on the first trading day after the announcement, closing at $0.51 on August 2, 2017.

18.     Shortly after the end of the Settlement Class Period, WIMC issued its restated financial results for the fiscal year ended December 31, 2016 and for the quarterly results for the fiscal quarters ended on June 30, 2016, September 30, 2016, and March 31, 2017 (the "Restatement").  Defendants admitted that prior to the Restatement they had been double-counting

estimated future taxable income in WIMC's DTA valuation allowance assessment.  The restated DTA balances were materially smaller than the previously reported balances—and, in two of the four periods restated, the decrease in DTA was larger than the originally-reported balances.

19.     Additionally, as a result of the material decrease in its DTA balances, WIMC's originally-reported stockholders' equity balances were restated downwards by a minimum of 177%, and in three of the four financial periods, WIMC's restated stockholders' equity balances were now negative.  Defendants also explained in the Restatement that although WIMC was able to obtain waivers and/or amendments of its debt agreements, the Company's capital resources were negatively impacted, that one of the Company's main subsidiaries was not in compliance with certain financial covenants, and that WIMC's adjusted net worth was less than half of what the GSEs required.

**B.     Commencement Of The Instant Action**

20.     Beginning on March 16, 2017, three putative securities class action complaints were filed in both the United States District Court for the Southern District of Florida and the Middle District of Florida.  On May 2, 2017, the parties in each of the putative securities class actions stipulated to transfer this Action to the Eastern District of Pennsylvania and to dismiss without prejudice the later filed putative securities class actions to coordinate pursuit of those claims with the parties in this Action.  *See* ECF No. 1-7.

21.     On May 15, 2017, Richard Worley and several other potential lead plaintiffs filed motions to be appointed lead plaintiff under the PSLRA and for appointment of their selected counsel.  *See* ECF Nos. 3-5.  All other lead plaintiff movants withdrew their motions and/or filed notices of non-opposition to Richard Worley's motion.  ECF Nos. 11, 13.

22.     On June 13, 2017, the Court appointed Richard Worley to serve as Lead Plaintiff in this Action and approved of Lead Plaintiff's selection of GPM to serve as Lead Counsel.  ECF No. 16.

C.        **The Preparation And Filing Of The Complaint**

23.      Lead Counsel conducted a detailed investigation of WIMC and the alleged fraud in connection with researching, preparing, and drafting the Complaint.  This investigation included, among other things: (a) review and analysis of (i) WIMC's public SEC filings, including the Company's annual and quarterly filings, the Company's May 26, 2017 announcement of its need to restate prior annual and quarterly financial filings due to the improper calculation of WIMC's DTA, WIMC's August 1, 2017 announcement of the Company's proposed financial restructuring agreement with certain of its debtholders, and the Company's August 9, 2017 Restatement, (ii) wire and press releases published by and regarding WIMC, (iii) public documents, reports, announcements, and news articles, (iv) research reports by securities and financial analysts, (v) economic analyses of securities movement and pricing data, and (vi) transcripts of WIMC's investor calls; as well as (b) interviews with former employees; (c) research regarding the applicable GAAP pertaining to DTA and the related valuation allowance assessment; (d) review and analysis of court filings in a previous securities litigation matter and public documents concerning various regulatory actions brought against WIMC and certain of its subsidiaries; and (e)  review and analysis of other publicly available material and data.  As part of this investigation, Lead Counsel also consulted with experts in the fields of accounting, loss causation, and damages.[9]

24.      On September 15, 2017, Lead Plaintiff served and noticed for filing the detailed and highly-technical 61-page Complaint.  *See* ECF Nos. 32, 33.  The Complaint asserts claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")

---

[9] On June 22, 2017, a shareholder derivative action titled *Michael E. Vacek, Jr., et al. vs. George M. Awad, et al.*, Case No. 2:17-cv-02820-JCJ (E.D. Pa.) was filed in this Court.  Although this derivative action included allegations relating to the Restatement, it also included allegations concerning other announcements made by the Company relating to certain of WIMC's subsidiaries. Lead Counsel did not coordinate with counsel in this action or receive any aid as a result of the derivative action.

and Rule 10b-5 promulgated thereunder against WIMC and the Individual Defendants (together, "Defendants"), and under Section 20(a) of the Exchange Act against the Individual Defendants.[10]

25.    The Complaint alleges that Defendants made materially false and misleading statements and omissions regarding WIMC's stockholders' equity and DTA balances, thereby fraudulently inflating the Company's stock price.  Specifically, the Complaint alleges that throughout the Settlement Class Period, Defendants misrepresented the value of WIMC's DTA balances by double-counting future taxable income when calculating the valuation allowance against WIMC's DTA balances, and that Defendants therefore also misrepresented the value of its stockholders' equity balances.

26.    The Complaint alleges that in response to the alleged March 14, 2017 re-characterization of WIMC's "capital efficiency efforts" as its "debt restructuring initiative," which indicated to the market that WIMC's stockholders' equity balance was at risk, the Company's stock fell almost 39%, or $1.05 per share.

27.    The Complaint also alleges that after the close of market on May 26, 2017, WIMC announced that due to a material accounting error relating to the duplication of part of the DTA valuation allowance calculation, its previous financial results for the second quarter, third quarter, and fiscal year of 2016, and the first quarter of 2017, would need to be restated, and that due to the need to restate its financial results, WIMC would need to seek amendments, waivers, and/or forbearances on a number of its financial covenants.  The Complaint alleges that these announcements indicated to the market that the Company's stockholders' equity balance was at risk

---

[10] The Individual Defendants are George M. Awad, WIMC's Interim CEO from June 30, 2016 through September 12, 2016 and Chairman of the Board of Directors from June 2016 through the end of the Settlement Class Period; Anthony N. Renzi, the Company's CEO and President from September 12, 2016 through the end of the Settlement Class Period; and Gary L. Tillett, the Company's CFO since March 2014 through the end of the Settlement Class Period.

of serious dilution.  In response to this announcement, WIMC's stock fell over 21%, or $0.30 per share, on the first trading day after the announcement.

28.     The Complaint further alleges that as part of Defendants efforts to obtain appropriate waivers and amendments to its financial covenants and debt agreements, on August 1, 2017, WIMC announced that it had agreed to a proposed financial restructuring of the Company, coming at a substantial cost to stockholders' equity, and that in response, WIMC's stock fell over 39% on the first trading day after the announcement, closing at $0.51 on August 2, 2017.

**D.     Defendants' Motion To Dismiss The Complaint And Lead Plaintiff's Opposition**

29.     On November 14, 2017, Defendants moved to dismiss the Complaint.  ECF No. 40. Defendants mainly argued that the Complaint should be dismissed for failing to allege scienter.

30.     Specifically, Defendants argued that Lead Plaintiff failed to allege facts giving rise to a "strong inference" of scienter as required to maintain a claim for securities fraud.  Defendants advanced a number of contentions in support of this argument, including that: (a) Lead Plaintiff did not allege that any defendant had a motive to commit fraud; (b) violations of GAAP, in and of itself, is not sufficient to allege scienter; (c) the calculation of DTA, and the consideration of whether to take a valuation allowance, is complex, and even so, the resulting Restatement only caused WIMC's assets to decrease by 2%, and thus it was "implausible" for Defendants to have intentionally overstated its DTA balances; (d) various Circuit Courts have found that previous disclosure of a company's poor financial condition negates an inference of scienter; (e) allegations of defendants as "hands-on" managers, the Individual Defendants' Sarbanes Oxley certifications, and settlements and government investigations into the Company do not support an inference of scienter; and (f) the inference that Defendants made a good faith mistake concerning the DTA calculation is more compelling than an inference than scienter.

10

31.     On December 29, 2017, Lead Plaintiff filed and served his opposition to Defendants'
motion to dismiss. *See* ECF No. 43.  In his opposition, Lead Plaintiff argued that the Complaint
adequately alleged a strong inference of scienter for all Defendants, because: (a) Defendants failed to
heed "red flags," including (i) the Company's cumulative and continued losses, (ii) analysts' pointed
questions regarding the large DTA balances, and (iii) Defendants' simultaneously-reported goodwill
impairments sufficiently indicated that they had clear reason to doubt its DTA balances; (b) the
magnitude of the Restatement was actually enormous and thus was material as evidenced by the
following: (i) the Restatement wiped out the entirety of WIMC's DTA and stockholders' equity
balances, (ii) during the Settlement Class Period Defendants admitted that a valuation allowance that
would deplete WIMC's DTA balance would be material, and (iii) the stockholders' equity balance
was a key financial figure for the market, and thus the obliteration of stockholders' equity was highly
material to investors; (c) Defendants only recorded a very small valuation allowance during the
Settlement Class Period, which was followed by the complete wipe-out of the Company's DTA
balance in the Restatement; (d) the Restatement admitted that the error resulting in the need to
restate the DTA balances was not due to judgment and/or estimates, but was the result of a
perfunctory calculation that was double-counting future taxable income as part of the valuation
allowance assessment; and (e) Defendants were motivated to overstate WIMC's DTA balances in
order to prop up its stockholders' equity balance and to maintain compliance with numerous
financial covenants and obligations with WIMC's lenders and with the GSEs.

32.     As explained in more detail in Section II.E below, due to WIMC's commencement of
a voluntary bankruptcy process, the time for all defendants to serve their reply papers in support of
their motion to dismiss was extended until after the Company emerged from the bankruptcy process.
*See* ECF No. 44.

E.     **WIMC's Bankruptcy And Lead Plaintiff's Successful Efforts In Negotiating A Carve-Out For The Claims In This Action**

33.     On November 30, 2017, WIMC filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to pursue the Prepackaged Plan.  WIMC notified this Court on December 1, 2017 of the pending bankruptcy, and that pursuant to the Bankruptcy Code this Action was automatically stayed as to WIMC.  ECF No. 41.

34.     Lead Plaintiff, through lead counsel, hired bankruptcy counsel to file a limited objection to WIMC's Prepackaged Plan on December 29, 2017 that would make clear that Lead Plaintiff and the putative class in this Action were not subject to the Plan's releases and that their claims against the defendants were unaffected by the Prepackaged Plan.

35.     Lead Plaintiff's bankruptcy counsel subsequently negotiated specific carve-out language for the claims brought in this Action with WIMC's bankruptcy counsel.  Bankruptcy counsel for Lead Plaintiff also specifically negotiated for WIMC to acknowledge on the record that the Prepackaged Plan did not relieve WIMC from continuing to comply with the PSLRA and the Federal Rules of Civil Procedure with respect to the preservation and maintenance of WIMC's documents that may be discoverable in this Action.

36.     On January 18, 2018, the Bankruptcy Court confirmed WIMC's Prepackaged Plan as modified to include, among others, a carve-out for Lead Plaintiff and the Settlement Class's claims brought by this Action.

37.     On February 9, 2018, WIMC notified the Court and the Parties in this Action that it had emerged from bankruptcy, and that the automatic stay in this Action had concluded.  ECF No. 45.

F.       **Mediation Efforts And The Negotiation Of The Settlement**

38.      While this Action was automatically stayed as to WIMC until its bankruptcy case concluded, the Parties agreed to engage in formal mediation in an effort to resolve this Action following WIMC's emergence from bankruptcy.

39.      Lead Plaintiff and Lead Counsel believed that a strategy of prompt mediation was in the best interests of Lead Plaintiff and the Settlement Class based largely on the uncertainty facing WIMC as it continued through the bankruptcy process and emerged from bankruptcy.  Moreover, while Lead Counsel was informed that some insurance coverage was available for the claims alleged in the Complaint, any available insurance was also being reduced by the costs of defending the Action, as well as the derivative action.  Lead Counsel and Lead Plaintiff were acutely aware that any insurance still available would have been depleted at a substantially greater rate if the actions proceeded into discovery or to trial.

40.      In addition, Defendants raised several credible arguments presenting significant hurdles in establishing scienter, including those set forth in their motion to dismiss.  While Lead Counsel believed and continues to believe that the Complaint adequately alleged scienter, it is possible that the Court could have agreed with Defendants that the more cogent and compelling inference was that Defendants made a mistake relating to the accounting error in WIMC's DTA calculation.

41.      The Parties agreed to retain Michelle Yoshida, Esq. of Phillips ADR to act as a mediator.  Ms. Yoshida is an experienced mediator who has successfully mediated numerous complex securities cases.

42.      On January 26, 2018, the Parties exchanged, and provided to Ms. Yoshida, detailed mediation statements and exhibits, which addressed issues of liability, loss causation, damages, and funding a settlement or judgment.  On February 15, 2018, the Parties participated in an all-day

mediation in New York, New York under the auspices of Ms. Yoshida. During the mediation the Parties vigorously advocated their positions and were pressed to confront the potential weaknesses in their positions and the strengths of the opposing side. Lead Plaintiff attended this lengthy mediation session together with Lead Counsel and was actively involved in all settlement discussions, demonstrating his diligent work on behalf of the Settlement Class. As a result of the Parties' discussions and the substantial efforts of Ms. Yoshida, the parties reached an agreement in principle to settle this Action for $2.95 million.

43.     On March 6, 2018, the Parties notified the Court that an agreement in principle to settle had been reached in this Action, and that the Parties were currently negotiating the terms of the proposed settlement, preparing definitive settlement documentation, and anticipated providing the finalized agreement and related document to the Court for its approval of the proposed settlement and noticed to the Settlement Class. *See* ECF No. 46. The Parties stipulated and agreed, and the Court approved, that Defendants' time to file their reply brief on the motion to dismiss was extended, and if the Court approved the proposed settlement, the need for Defendants to file a reply brief would be moot. *Id.*

44.     The Stipulation was executed on July 13, 2018 and was submitted to the Court as part of Lead Plaintiff's July 13, 2018 motion for preliminary approval of the Settlement, certification of the Settlement Class, and approval of the form and manner of providing notice of the Settlement to the Settlement Class. *See* ECF No. 47.

### G.     Preliminary Approval Of The Settlement

45.     On August 2, 2018, the Court entered the Preliminary Approval Order, which preliminarily approved the Settlement, certified the Settlement Class for settlement purposes, appointed Lead Plaintiff as class representative, and appointed Lead Counsel as class counsel. *See* ECF No. 49 (the "Preliminary Approval Order").

46.     The certified Settlement Class is defined as follows:

> All persons and entities who or which purchased WIMC common stock between August 9, 2016 and August 1, 2017, inclusive and were damaged thereby. Excluded from the Settlement Class are Defendants, officers and directors of WIMC during the period between August 9, 2016 and August 1, 2017, inclusive, members of their Immediate Families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest during the Settlement Class Period. Also excluded from the Settlement Class are any persons or entities who or which exclude themselves by submitting a request for exclusion that is accepted by the Court.

Preliminary Approval Order, ¶ 1; Stipulation ¶ 1(pp).

## III.     RISKS OF CONTINUED LITIGATION

47.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a cash payment of $2.95 million. As explained below, there were significant risks that Lead Plaintiff and the Settlement Class might recover substantially less than the Settlement Amount – or nothing at all – if the case proceeded through additional years of litigation to a potentially litigated verdict, followed by the inevitable appeals. Indeed, WIMC's precarious financial condition and limited insurance, which would be eroded by substantial defense costs in this Action and the shareholder derivative action, created the very real risk that Lead Plaintiff would not be able to recover on a judgment as large as the Settlement after trial and appeal. Defendants also had or potentially had substantial arguments with respect to liability, loss causation, and damages in this case. Thus, there was simply no guarantee that Lead Plaintiff and the Settlement Class would achieve any recovery, let alone one greater than $2.95 million.

### A.     Ability To Pay Risks

48.     WIMC's financial condition has deteriorated severely both in the years leading up to and since this Action commenced in March 2017. As noted above, WIMC greatly expanded many of its business segments via acquisitions between 2011 and 2013, taking on massive debt to effectuate the acquisitions. Those acquisitions proved to be less successful than the Company had

anticipated, resulting in a steady decline of WIMC's stock price over the last five years and successive quarters of reported losses.  During the middle of the Settlement Class Period, WIMC: (a) reported its **eleventh** straight quarter of losses; (b) disclosed on March 14, 2017, that the Company had engaged legal and financial advisors to review potential actions that Defendants could take to reduce the Company's leverage as part of its "debt restructuring initiative"; and (c) disclosed on August 1, 2017, that as part of its efforts to obtain appropriate waivers and amendments to its financial covenants and debt agreements, it had agreed to a proposed financial restructuring of the Company.  In fact, the crux of Lead Plaintiff's allegations center around WIMC's dwindling stockholders' equity balances during the Settlement Class Period, and that these balances were materially false and misleading as a result of Defendants' overstatement of WIMC's DTA balances. At the end of the Settlement Class Period, WIMC's common stock was trading at just $0.50 per share.  After WIMC restated its Settlement Class Period financials on August 9, 2017, the Company reported stockholder equity **deficits** in the tens of millions.

49.     In its Restatement, WIMC also expressed substantial doubt about its ability to continue as a going concern due to its agreed upon proposed financial restructuring of the Company. WIMC further warned that even if the proposed restructuring was consummated, its ability to continue as a going concern was not assured due to its continuing struggles in reducing the Company's expenses and in returning its business segments to profitability.  On November 9, 2017, WIMC filed a voluntary bankruptcy petition to pursue the proposed restructuring as announced on August 1, 2017.  *See* Section II.E, *supra*.

50.     As a result of WIMC's precarious financial position and WIMC's bankruptcy filing, Lead Plaintiff and Lead Counsel believed at the time the Settlement was reached that the Company had little or no assets to pay a judgment and thus there was a very substantial risk that, even if Lead

Plaintiff prevailed on all issues through the remainder of the litigation and secured a verdict at trial, such a victory might be meaningless to the class because they would not be able to recover on that judgment.

51.     Lead Plaintiff also faced the risk that the Company's financial position would not drastically change after WIMC emerged from bankruptcy.  In fact, in the Company's latest quarterly financial report for the period ended June 30, 2018, WIMC again reported a loss and warned investors that it "continues to forecast reductions in liquidity that may become more challenging if there is further deterioration due to required repayment terms and restrictive covenants" of one of its loans, recurring operating losses, and negative cash flows in certain of its business segments.

52.     WIMC's precarious financial condition meant that its insurance coverage was likely the only practical source of any substantial recovery.  This limited pool of money covered litigation costs for this Action, as well as the shareholder derivative action based on facts substantially similar to those alleged in this Action.  These funds would be rapidly drained by defense costs if the Company continued to litigate this Action and the derivative action.  Accordingly, the very significant risk that continued litigation might yield a smaller recovery – or no recovery at all – several years in the future supported entering into the Settlement.

**B.     Risks Of Proving Liability**

53.     Lead Plaintiff and Lead Counsel recognized that this Action presented a number of substantial risks to establishing liability.  The fact that WIMC issued a restatement of its Settlement Class Period financial results served as an admission that: (a) WIMC's DTA and stockholders' equity balances were materially false when made; and (b) there was a material weakness relating to the ineffective review of the tax calculations associated with the valuation allowance on the DTA balances, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures were ineffective.  However, establishing that the admitted false financial

17

results were made with an intent to defraud investors or to inflate WIMC's stock price was a separate and much more significant hurdle, one that presented risks at both the motion to dismiss stage, where Lead Plaintiff was required to plead facts raising a strong inference of scienter, and at trial, where Lead Plaintiff would have to prove scienter to a factfinder after development of the factual record.

54.     Indeed, despite believing that they had potentially meritorious arguments, Lead Counsel was well aware of the high hurdle they would have to surmount in order to successfully allege (and then prove) that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws. *See, e.g.*, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009) (O'Connor, A.J., sitting by designation) ("To be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action.").

55.     Here, Defendants argued that they lacked any motive to commit fraud, and because WIMC was preparing to file bankruptcy and restructure the Company, it was illogical for Defendants to intentionally misstate the DTA balances on WIMC's balance sheet.  In addition, Defendants argued that while WIMC's accounting error was a violation of GAAP, a violation of GAAP alone is insufficient to establish scienter.  Defendants further asserted that the size and nature of the Restatement was insignificant.  And, even if the size and nature of WIMC's accounting error was significant, it did not give rise to a strong inference of scienter in the context of WIMC's overall business (specifically that WIMC's DTA balances represented just 2% of the Company's total assets reported on its balance sheet).  Thus, to prevail, Lead Plaintiff would have had to demonstrate to the Court and/or jury that, on a holistic basis, Defendants intentionally and/or recklessly misstated the DTA balances to mislead investors.  This would not be an easy task and, despite Lead Plaintiff's strong counter-arguments, there was no guarantee that Lead Plaintiff would have prevailed on the

scienter issue at the pleading stage, let alone at summary judgment and trial after development of the evidentiary record.

### C.    Risk Of Proving Loss Causation And Damages

56.    Even assuming that Lead Plaintiff overcame the above risks and successfully established Defendants' liability, Lead Plaintiff would have confronted considerable challenges in establishing loss causation and damages.

57.    First, Lead Counsel and Lead Plaintiff recognize that they faced substantial hurdles in establishing loss causation with respect to the decline in stock price in reaction to WIMC's announcement on March 14, 2017 that it had engaged in legal and financial advisors to review potential actions that the Company could take to reduce its leverage as part of WIMC's "debt restructuring initiative."  Lead Plaintiff alleged that this announcement was a partial materialization of the risk that WIMC's shareholder equity would be further diluted.  But, Defendants would likely have argued that this Action is limited to its DTA valuation allowance error, and as such, would have strong arguments that the stock decline following the announcement of WIMC's "debt restructuring initiative" was not attributable to any disclosure of fraud.

58.    Similarly, although Lead Plaintiff alleged that the August 1, 2017 announcement of a proposed financial restructuring of WIMC and receipt of waivers and amendments to its financial covenants and debt agreements came at a substantial cost to WIMC's stockholders' equity balances, Defendants would have likely argued that this announcements was similarly unrelated to the DTA valuation allowance error.  Furthermore, Defendants would have likely argued that it was not the DTA restatement that triggered the proposed restructuring, and that WIMC had signaled such a restructuring was possible in its March 14, 2017 announcement of its "debt restructuring initiative."

59.    Finally, with respect to the decline following the May 26, 2017 announcement in which the Company disclosed that due to the material DTA valuation allowance error, the Settlement

Class Period financial results would need to be restated and as a result, WIMC would need to seek amendments, waivers, and/or forbearances on a number of its financial covenants, Defendants would have asserted that a substantial portion of the decline was due to the disclosure of other information unrelated to the alleged fraud.

60.     In sum, had any of Defendants' loss causation and damages arguments been accepted, they could have dramatically limited any potential recovery.

### D.     Other Risks

61.     In addition to the pending motion to dismiss, Lead Plaintiff would also have had to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this.  For example: Lead Plaintiff would have to prove market efficiency and satisfy the requirements of Rule 23 to prevail on a motion for class certification; he would have to conduct substantial discovery, the costs of which are assuredly high and the fruits of which are highly uncertain; he would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial; and, finally, even if Lead Plaintiff prevailed on all of those stages, he would have to succeed on any appeals that would likely follow.  This process typically extends for years and might lead ultimately to a smaller recovery or no recovery at all. Indeed, even prevailing at trial would not have guaranteed a recovery larger than the $2.95 million Settlement because, among other reasons, continued litigation would have further depleted – or exhausted – the Company's D&O insurance funds.

62.     Given these significant litigation risks, Lead Plaintiff and Lead Counsel believe that the Settlement represents an excellent result for the Settlement Class.

### E.     The Settlement Is Reasonable In Light Of The Potential Recovery In The Action

63.     In addition to the attendant risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of damages available.  Employing a two-trader model with an appropriate volume reduction – the preferred approach used to estimate aggregate damages in securities class actions – and taking into consideration the "lookback period" limitation on damages under the PSLRA, Lead Plaintiff's damages expert estimated the *maximum* aggregate § 10(b) damages potentially available in this case to be approximately $15.8 million in this case. This number assumes that Lead Plaintiff would have been able to prove *all* aspects of his case at trial, and then prevail on the inevitable appeals.  Under this scenario, the $2.95 million Settlement represents approximately 18.7% of the maximum damages.

64.     In contrast, Defendants would have contended that Lead Plaintiff's damages were greatly overstated.  As noted above in ¶¶ 56-60, Lead Plaintiff believes that Defendants could put forward several damages and loss causation arguments that, if accepted, would have greatly reduced damages.  Specifically, if these arguments were accepted, maximum damages would have been reduced to the $3.2 million to $6.6 million range.  Accordingly, the proposed Settlement, $2.95 million, represents approximately 18% of Lead Plaintiff's estimate of *maximum* provable damages, and 45% to 92% of Defendants' estimate of *maximum* damages.  This level of recovery is reasonable in light of the significant litigation risks and the very serious ability-to-pay risks.

## IV.     LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

65.     The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to

the Settlement Class.  On August 27, 2018, the Court set a settlement hearing for December 5, 2018.

ECF. No. 50.  Based on this hearing date and the Preliminary Approval Order, the deadline for

Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the

Fee and Expense Application or to request exclusion from the Settlement Class is November 14,

2018.

66.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed A.B. Data, Ltd.

("A.B. Data"), the Court-approved Claims Administrator, to begin disseminating copies of the

Notice and the Claim Form by mail and to publish the Summary Notice.  The Notice contains,

among other things, a description of the Action; the definition of the Settlement Class; a summary of

the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement

Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of

Allocation, and/or the Fee and Expense Application, or exclude themselves from the Settlement

Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an

award of attorneys' fees in an amount not to exceed $33^{1}/_{3}$% of the Settlement Fund, and for

reimbursement of litigation expenses in an amount not to exceed $125,000.  To disseminate the

Notice, A.B. Data obtained from WIMC's transfer agent the names and addresses of 137 potential

Settlement Class Members.  *See* Declaration of Eric A. Nordskog Regarding: (A) Mailing of the

Notice and Proof of Claim and Release Form; (B) Publication of the Summary Notice; (C) Report on

Requests for Exclusion Received to Date; and (D) Report on Volume of Claims Received to Date

("Nordskog Decl."), attached hereto as Exhibit 1, ¶ 3.  On August 30 2018, A.B. Data disseminated

copies of the Notice and Claim Form (together, the "Notice Packet") to each of the 137 potential

Settlement Class Members by first-class mail.  *Id.*

67.     In addition, A.B. Data maintains a proprietary database containing 5,020 mailing records with the names and addresses of the largest and most common banks, brokers, and other nominees (the "Record Holder Mailing Database"). *See id.* at ¶ 4. On August 30, 2018, 2018, A.B. Data disseminated copies of the Notice Packet to the 5,020 mailing records in the Record Holder Mailing Database by first-class mail. *See id.* A.B. Data also received additional names of potential Settlement Class Members from various sources and forwarded Notice Packets to each potential Settlement Class Member. *Id.* at ¶ 6. As of October 26, 2018, A.B. Data had disseminated 12,630 Notice Packets. *See id.* ¶ 8.

68.     In accordance with the Preliminary Approval Order, A.B. Data caused the Summary Notice to be published once in *Investor's Business Daily* and released over the *PR Newswire* on September 10, 2018. *See id.*, ¶ 9.

69.     Lead Counsel also caused A.B. Data to establish a dedicated settlement website, http://www.walterinvestmentsettlement.com, to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Notice Packet, as well as copies of the Stipulation, Preliminary Approval Order, and other documents filed in this Action. *See id.*, ¶ 11.

70.     The deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is November 14, 2018. As of October 26, 2018, no requests for exclusion have been received (*see* Nordskog Decl., ¶ 12), and no objections to the Settlement, the Plan of Allocation or Plaintiff's Counsel's Fee and Expense Application have been received. *See id.* at ¶ 13. Pursuant to the Preliminary Approval Order, Lead Counsel will file reply papers by November 30, 2018. The reply papers will address any requests for exclusion and any objections that may be received.

## V.     ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

71.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, and (c) any Attorneys' Fees and Litigation Expenses awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than December 20, 2018.  As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

72.     Lead Plaintiff's damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel.  Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Complaint.

73.     The Plan of Allocation is set forth at pages 9 to 11 of the Notice, attached as Exhibit A to the Nordskog Declaration.  As described in the Notice, calculations under the Plan of Allocation are not intended be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover at trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.

74.     In developing the Plan of Allocation, Lead Plaintiff's damages expert calculated the estimated amount of artificial inflation in the per share closing prices of WIMC common stock which was allegedly caused by Defendants' false and misleading statements and material omissions. In calculating the estimated artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered price changes in WIMC

common stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces.

75.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or other acquisition of WIMC common stock during the Settlement Class Period that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including when each share of WIMC common stock was purchased or acquired and sold, and at what price.  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale, or the difference between the actual purchase price and sales price, whichever is less.  *See* Notice ¶ 69.  The sum of a Claimant's Recognized Loss Amounts is the Claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  *See* Notice ¶¶ 72, 73.

76.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in WIMC common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

77.     As noted above, as of October 26, 2018, 12,630 copies of the Notice, which contains the Plan of Allocation, and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members.  *See* Nordskog Decl. ¶ 13. To date, no objections to the proposed Plan of Allocation have been received.

## VI.   THE FEE AND LITIGATION APPLICATION

78.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 33$^{1}/_{3}$% of the Settlement Fund (or $983,333.33 plus interest earned at the same rate as the Settlement Fund).  Plaintiff's Counsel also requests reimbursement of out-of-pocket Litigation Expenses that Plaintiff's Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $89,333.53.  Finally, Plaintiff's Counsel requests reimbursement to Lead Plaintiff in the total amount of $10,000 for costs and expenses he incurred directly related to their representation of the Settlement Class pursuant to 15 U.S.C. § 78u-4(a)(4).  The legal authorities supporting the requested fee and reimbursement of Litigation Expenses are set forth in the concurrently-filed Fee and Expense Application.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A.     The Fee Application

79.     For their efforts on behalf of the Settlement Class, Plaintiff's Counsel are applying for a percentage of the common fund fee award to compensate them for the services they have rendered to the Settlement Class on a fully contingent basis.  As set forth in the accompanying Fee and Expense Application, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with the interest of the Settlement Class.  The lawyers are incentivized to achieve the maximum recovery in the shortest amount of time required under the circumstances.  Notably, the percentage of the fund method has been recognized as appropriate by the Supreme Court and Third Circuit for cases of this nature.

80.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is fair and reasonable and should be

26

approved.  As discussed in the Fee and Expense Application, a $33^1/_3\%$ fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

### 1.     Lead Plaintiff Supports The Fee Application

81.     As set forth in the declaration submitted by Lead Plaintiff, Lead Plaintiff has concluded that Plaintiff's Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action.  *See* Declaration of Richard Worley, in Support of (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; (B) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses; and (C) Lead Plaintiff Richard Worley's Request for Reimbursement of Costs and Expenses (the "Worley Decl."), attached hereto as Exhibit 2, ¶ 11.  Mr. Worley has been intimately involved in this case since its earliest stages, and I would respectfully submit that his endorsement of Plaintiff's Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

### 2.     The Work and Experience of Counsel

82.     As set forth below, GPM's total lodestar is $744,516.50,[11] consisting of $724,680.50 for attorney time and $19,836.00 for professional support staff time:

---

[11] The lodestar figure contains only the time of GPM attorneys and professional staff that billed more than ten hours to the Action.

**GPM Lodestar Chart**

| TIMEKEEPER/CASE | STATUS | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| ATTORNEYS: | | | | |
| Robert Prongay | Partner | 107.00 | $725.00 | $77,575.00 |
| Peter A. Binkow | Of Counsel | 53.00 | $850.00 | $45,050.00 |
| Joseph Cohen | Partner | 82.00 | $925.00 | $75,850.00 |
| Lesley Portnoy | Partner | 157.00 | $635.00 | $99,695.00 |
| Lee Albert | Partner | 25.10 | $925.00 | $23,217.50 |
| Jennifer Leinbach | Associate | 80.30 | $525.00 | $42,157.50 |
| Christopher Fallon | Associate | 102.50 | $525.00 | $53,812.50 |
| Leanne Heine Solish | Associate | 555.30 | $525.00 | $291,532.50 |
| Melissa Wright | Associate | 31.90 | $495.00 | $15,790.50 |
| TOTAL ATTORNEY | | 1,194.10 | | $724,680.50 |
| PARALEGALS: | | | | |
| Harry Kharadjian | Senior Paralegal | 39.50 | $290.00 | $11,455.00 |
| Erin Krikorian | Research Analyst | 10.10 | $290.00 | $2,929.00 |
| Michaela Ligman | Research Analyst | 18.80 | $290.00 | $5,452.00 |
| TOTAL PARALEGAL | | 68.40 | | $19,836.00 |
| TOTAL LODESTAR | | 1,262.50 | | $744,516.50 |

83.   The Lodestar Chart sets forth the amount of time GPM attorneys and professional support staff billed from inception of the Action through and including October 30, 2018, and the lodestar calculation for those individuals based on GPM's current billing rates.

84.   The hourly rates for GPM's attorneys and professional support staff are substantially the same as rates that have been accepted by courts in other securities or shareholder litigation. Additionally, when determining the market rate by looking at fees awarded in similar cases, the rates billed by Lead Counsel (ranging from $495-$525 per hour for non-partners and $635-$925 per hour for partners and "Of Counsel" attorneys) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 3 attached hereto (table of peer firm billing rates).

85.     The Lodestar Chart was prepared from contemporaneous daily time records regularly prepared and maintained by GPM.   Time expended on GPM's application for fees and reimbursement of Litigation Expenses has not been included in this request.

86.     In addition, the Rosen Law Firm filed the initial complaint in this Action in the United Stated District Court for the Southern District of Florida, conferred with the other plaintiffs in the two other class action complaints filed in the United Stated District Court for the Middle District of Florida and with defendants, negotiated the stipulation in which it was agreed to transfer the litigation to the Eastern District of Pennsylvania, and assisted Lead Counsel in drafting pleadings and court filings.  *See* Declaration of Phillip Kim ("Rosen Decl.") , attached hereto as Exhibit 4, ¶ 2. The Rosen Law Firm's lodestar is $7,545 for attorneys' time.  *Id.* at ¶¶ 3-6, Ex. 1.

87.     Thus, the resulting total lodestar for Plaintiff's Counsel is $752,061.50.   The requested fee of $33^{1}/_{3}$% of the Settlement Fund represents $983,333.33 (plus interest), and therefore represents a multiplier of 1.31 to Plaintiff's Counsel's lodestar.  I believe that this multiplier is fair and reasonable based on the risks of the litigation, the quality of the representation, and the results obtained.  As discussed in further detail in the Fee and Expense Application, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

88.     Throughout this Action, Lead Counsel devoted substantial time to the prosecution of the Action.  Senior attorneys drafted, reviewed, and/or edited all pleadings, court filings, mediation statements, and other correspondence prepared on behalf of Lead Plaintiff, communicated with Lead Plaintiff on a regular basis, hired and engaged with bankruptcy counsel, engaged with defense counsel on a variety of matters, and were intimately involved in Settlement negotiations.  Junior attorneys and paralegals worked on matters appropriate to their skill and experience level.

29

Throughout the litigation, Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation

89.     As demonstrated by the GPM firm resume attached as Exhibit 5 hereto, Lead Counsel is experienced in the securities litigation field, with a long and successful track record representing investors in such cases.  GPM has successfully prosecuted securities class action cases and complex litigation in federal and state courts throughout the country.  Additionally, as demonstrated by its firm resume, attached as Exhibit 3 to the Rosen Decl., the Rosen Law Firm also has years of experience in prosecuting securities class action cases throughout the country.  I believe counsel's experience added valuable leverage in the settlement negotiations.

### 3.     Standing And Caliber Of Opposing Counsel

90.     The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Dechert, LLP, Hangley Aronchick Segal Pudlin & Schiller, and Weil, Gotshal & Manges LLP, all of which are capable law firms that vigorously represented the interests of their clients throughout this Action.  In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to persuade Defendants to settle the Action on terms favorable to the Settlement Class.

### 4.     The Risks Of Litigation And Need To Ensure The Availability Of Competent Counsel In High-Risk, Contingent Securities Cases

91.     This prosecution was undertaken by Plaintiff's Counsel on an entirely contingent-fee basis.  From the outset, Plaintiff's Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Plaintiff's Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the

Action, and that funds were available to compensate attorneys and staff and to cover the considerable litigation costs that a case like this requires.

92.     With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiff's Counsel have received no compensation during the course of the Action, and have incurred a combined total of over $89,333.53 in unreimbursed out-of-pocket litigation-related expenses in prosecuting the Action.

93.     Plaintiff's Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever.  Despite the most vigorous and competent of efforts, success in contingent-fee litigation like this is never assured.  Plaintiff's Counsel know from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

94.     Moreover, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("private securities litigation is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets." (internal quotation marks omitted)).  If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.

95.     Plaintiff's Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.  In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 5.     The Reaction Of The Settlement To The Fee Application

96.     As noted above, as of October 26, 2018, 12,630 Notice Packets had been mailed advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed $33^{1}/_{3}$% of the Settlement Fund.  *See* Nordskog Decl. at ¶ 8; Notice ¶ 5. In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  Nordskog Decl. ¶ 9.  To date, no objections to the attorneys' fees set forth in the Notice have been received.  Should any objections be received after the date of this filing, they will be addressed in Plaintiff's Counsel's reply papers.

97.     In sum, Plaintiff's Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, I respectfully submit that a fee award of $33^{1}/_{3}$%, resulting in a multiplier of 1.31, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

### B.     The Litigation Expense Application

98.     Plaintiff's Counsel seek a combined total of $99,333.53 in Litigation Expenses, to be paid from the Settlement Fund.  This amount includes $87,228.89 in costs and expenses reasonably incurred by Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the Action; $2,104.64 incurred by the Rosen Law Firm; and $10,000 in costs incurred by Lead Plaintiff.

99.    As detailed below, GPM is seeking reimbursement of a total of $87,228.89[12] in

Litigation Expenses:

**GPM Expense Chart**

| ITEM | AMOUNT |
|------|--------|
| COURIER & SPECIAL POSTAGE | $266.55 |
| COURT FILING FEES | $80.00 |
| DOCUMENT MANAGEMENT | $69.97 |
| EXPERTS ACCOUNTING | $6,813.00 |
| EXPERTS DAMAGES | $9,400.00 |
| BANKRUPTCY EXPERTS | $36,300.92 |
| INVESTIGATIONS | $7,231.25 |
| MEDIATION | $10,000.00 |
| ONLINE RESEARCH | $2,747.72 |
| TRAVEL AIRFARE | $2,907.20 |
| TRAVEL AUTO | $752.57 |
| TRAVEL HOTEL | $4,007.00 |
| TRAVEL MEALS | $3,592.71 |
| TRAVEL PARKING | $60.00 |
| TRAVEL FINAL APPROVAL | $3,000.00 |
| GRAND TOTAL | $87,228.89 |

100.    The Rosen firm requests reimbursement of Litigation Expenses in the amount of

$2,104.64.  *See* Rosen Decl. at ¶¶ 7-8 & Ex. 2.

101.    Additionally, Lead Plaintiff seeks reimbursement of his reasonable costs and

expenses directly incurred in connection with his representation of the Settlement Class, in the

amount of $10,000.  *See* Worley Decl. at ¶¶ 13-14.  Mr. Worley communicated frequently with

attorneys at our firm regarding, for example (a) case developments, (b) litigation strategy, and (c) the

Settlement.  Mr. Worley always made himself freely available to perform his Lead Plaintiff

functions.

---

[12] This figure includes $3,000 in travel expenses that Lead Counsel has not yet incurred but estimates
to incur in connection with traveling to and attending the Final Approval Hearing on December 5,
2018.

102.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses on behalf of all Plaintiff's Counsel in an amount not to exceed $125,000.  The total amount requested, $99,333.53, which includes the Litigation Expenses of Lead Plaintiff and Plaintiff's Counsel, is significantly below the $125,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Plaintiff's Counsel will address it in their reply papers.

103.    From the beginning of the case, Plaintiff's Counsel was aware that they might not recover any of their expenses, and, even in the event of a recovery, would not recover any of its out-of-pocket expenditures until such time as the Action might be successfully resolved.  Plaintiff's Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced by it to prosecute the Action.  Accordingly, Lead Counsel was motivated to and did take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the case.

104.    Of the total amount of Litigation Expenses, $52,513.92, or 53%, was expended on Lead Plaintiff's experts, consultants, and bankruptcy counsel.  As noted above, Lead Plaintiff retained and consulted experts in the fields of accounting and damages to assist in the preparation of the Complaint and the prosecution of the Action.  Lead Plaintiff's damages expert also assisted Lead Counsel during the mediation and settlement negotiations with the Defendants and with the development of the proposed Plan of Allocation.  Furthermore, as noted above, Lead Plaintiff,

through Lead Counsel, engaged bankruptcy counsel to seek a carve out for Lead Plaintiff's and the putative class's claims in this Action from WIMC's Prepackaged Plan as modified.

105.    Additionally, Lead Counsel paid $10,000 for their share of the mediation fees charged by Ms. Yoshida, which is 10% of the total Litigation Expenses.

106.    The other Litigation Expenses for which Lead Counsel seeks reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These Litigation Expenses include, among others, court fees, costs of out-of-town travel, copying costs, long distance telephone and facsimile charges, costs for on-line legal and factual research, and postage and delivery expenses.

107.    In my opinion, the expenses incurred by Plaintiff's Counsel and Lead Plaintiff were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, I respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.    CONCLUSION

108.    For all the reasons set forth above, I respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  I further submit that the requested fee in the amount of $33^{1}/_{3}$% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total Litigation Expenses in the amount of $99,333.53, which includes $10,000 for Lead Plaintiff's costs and expenses, should also be approved.

I declare, under penalty of perjury under the laws of the United States, that the foregoing facts are true and correct.

Executed this 31st day of October, 2018.

_____
LEE ALBERT

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 31, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of Pennsylvania, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 31, 2018.


*s/ Lee Albert*
Lee Albert